196 So. 268

## GRAMMER v. STATE.

6 Div. 458.

Supreme Court of Alabama.

Jan. 11, 1940.

Rehearing Denied April 4, 1940.

Further Rehearing Denied June 6, 1940.

Thos. S. Lawson, Atty. Gen., and Geo. Lewis Bailes, Circuit Sol., and Robt. G. Tate, Deputy Circuit Sol., both of Birmingham, for the State.

Andrew W. Griffin and Frank M. James, both of Birmingham, for appellant.

FOSTER, Justice.

Appellant was tried and convicted of murder in the first degree for killing one Hammett by cutting him with a knife, and given a life sentence in the penitentiary. His plea was not guilty and not guilty by reason of insanity.

There was no question reserved for our consideration under his plea of not guilty, but all questions relate to that of insanity.

The fight occurred August 3, 1937, and Hammett died September 3, 1937. On November 9, 1937, a hearing was had under section 4577, Code, as to the sanity of defendant then existing, the court having appointed a doctor to examine into his mental condition. Upon such hearing, the court ordered him to the State Insane Asylum. On July 2, 1938, the court made an order that, since the superintendent of the hospital had certified that he was not then insane, he be returned to the county jail for trial, and he was tried and convicted on January 9, 1939.

The evidence of insanity offered by defendant tended to show that his grandfather and grandmother were both insane, though none of their children had become so, and defendant is the only one of nine brothers and sisters to be so afflicted.

Defendant was a World War veteran, and was discharged honorably in 1919, and married in 1920, and had children. He was in various veterans' hospitals on account of his abnormal mental condition.

On October 22, 1933, he was adjudged insane in the Probate Court of Tuscaloosa County, and committed to the United States Veterans' Hospital. His record showed treatment at various facilities, and that about 1926, he was using alcohol excessively, and had a distinct change of personality, diagnosed as dementia præcox, simple type; and at another time it was diagnosed as a paranoid type. The report showed that afterwards in the hospital his only abnormality manifested was his inability to abstain from using liquor, and was criminally insane when under its influence.

He was in and out of the hospital on several occasions.

Dr. Edwards, a general practitioner of medicine, testified for defendant, that he was the family physician, but not a specialist on mental disorders. He diagnosed his condition prior to 1936, which was the last time he talked to him as "cyclic insanity." On some occasions he was practically normal; at other times he appeared nervous and was not normal, and at other times absolutely insane; that it was in the form of dementia præcox of which "cyclic" insanity was a type. His opinion was that defendant's condition was permanent, but "not always". When he is laboring under one of those spells of insanity, he might not be able to distinguish between right and wrong; that he is not at all times, at least, accountable for what he does, good or bad.

Dr. Littlejohn, a specialist on mental diseases, who examined defendant in November, 1937, at the instance of the court to determine his mental status at that time, examined him only one time in the county jail. He testified to various symptoms and his historic record. Upon the basis of a hypothetical question, he answered that defendant was probably insane August 3, 1937; that probably he had dementia præcox. It may be simple or paranoid, that is, without or with delusions. This is a permanent form of insanity with remissions. A patient under a remission probably would be able to determine right from wrong, probably not if he was in a spell, and not in a remission. That he would not express an opinion as to whether he was insane at the time of the killing; that it takes a long period of observation to diagnose dementia præcox.

Dr. Kay testified for the State. He is a specialist in mental diseases, and is a staff physician at the Bryce Hospital. Defendant was under his observation November 13, 1937, to July 2, 1938, when he was discharged. He was brought before the entire medical staff on several occasions for clinical conference; that it was the unanimous opinion of the entire staff in all the conferences that he was not insane, based on a review of the history of his case, his behavior in the hospital, and examinations and observations of him. Whereupon Dr. Partlow, the superintendent, directed his return for trial under this charge.

There were seven physicians and the clinical director on the staff. They thought he was not insane, but dangerous to society after a long period of anti-social and dangerous behavior; that he knows right from wrong, but does not always take into consideration the price he has to pay for his conduct; and when drinking he was a menace to society. That he did not have dementia præcox. A person with such affliction would have a different picture of symptoms, which Dr. Kay epitomized. But

that there is a tendency when he is so afflicted to improve some, and be better at times—but it is present all the time when it exists. There are variations to the intensity with which the symptoms are evidenced; that a severe case would render one incompetent to control his acts.

Appellant assigns errors. The first argued in brief are 2, 3 and 4, which are discussed together. They are refused charges, as follows:

"18. The court charges the jury that if you are reasonably satisfied from the evidence that prior to the time of the difficulty between defendant and deceased, the defendant was afflicted with a mental disease, and that the mental disease was of a permanent type, then the mental disease is presumed to continue and the burden rests on the State to prove to your reasonable satisfaction that the defendant was not suffering from the mental disease at the time the defendant had the difficulty with deceased."

"19. The court charges the jury that if you are reasonably satisfied from the evidence that the defendant, prior to the time of the difficulty between defendant and deceased, was insane, and that his insanity was of a permanent type, then there is a presumption that the insanity continued."

"23. The court charges the jury that if you are reasonably satisfied from the evidence that prior to the time of the difficulty between defendant and deceased, that defendant had been judicially declared insane by the Probate Court of Tuscaloosa County, Alabama, and if you are further reasonably satisfied from the evidence that the insanity he was declared to be afflicted with was of a permanent type, then it is presumed that the insanity continued, and the burden rests on the State to prove to your reasonable satisfaction that the crime charged against defendant, was committed at a time when the defendant was not laboring under the duress of the disease."

Charges 18 and 23 misplace the burden of proof in respect to the plea of not guilty by reason of insanity. Such a defense must be "clearly proved to the reasonable satisfaction of the jury." Section 4572, Code. This puts the burden on the defendant, not to make out a prima facie case of insanity, nor to raise a reasonable doubt as to it, and to carry that burden throughout the trial, not discharged until the jury is reasonably satisfied of defendant's insanity. The burden in this respect never shifts to the State nor rests on the State. Parrish v. State, 139 Ala. 16(24), page 50, 36 So. 1012; Anderson v. State, 209 Ala. 36(9), 95 So. 171; Boyle v. State, 229 Ala. 212, 154 So. 575.

Charge 19 is the statement of what is supposed to be a scientific fact of more or less value in such a trial as this.

But it gives no direction to the jury as to the effect of such a presumption from such a finding as here applied. And has a misleading tendency whereby the jury might conclude that such a presumption required a finding of not guilty. But the evidence is that though he might have had a permanent form of insanity, it was such as that at times he was legally responsible for his misconduct. At times, he may not have been. Under the statute the burden was on defendant to show that at the time of doing the act, he was incompetent to control himself, though he may have had a permanent form of insanity, if in such condition there were times when he was competent to know right from wrong, and control his actions.

When there is proof of such intervals of lucidity, the principle that a permanent form is presumed to continue (Odom v. State, 174 Ala. 4, 56 So. 913) does not mean that there is a presumption against the idea that he may have acted in a lucid interval. Talbert v. State, 140 Ala. 96, 37 So. 78.

Moreover, the jury might suppose from this charge that any form of permanent insanity existing at the time of the offense prevented a finding of guilty whether or not the crime was the effect of the insanity. The unsoundness of mind may have had no influence upon the act of defendant on that occasion. To be in position of irresponsibility for the commission of an alleged crime by reason of insanity, the act of defendant, alleged to be a crime, must have been the product solely of the deranged mental condition. Parsons v. State, 81 Ala. 577, 2 So. 854, 60 Am.Rep. 193.

There may be other reasons why the charge was refused without error, not necessary here to consider.

Assignments 5 and 6. The court is here requested to charge the jury that dementia præcox is a permanent type of insanity.

But we observe that this is not a matter of such general scientific knowledge that

the court will take judicial notice of it. Assuming that there is no tendency of the evidence to the contrary, the fact is dependent upon oral testimony expressing the opinion of witnesses. When so, the court will not ordinarily be held to be in error in thus stating the proven fact, neither will he be held to be in error for refusing to do so. Carter v. Chambers, 79 Ala. 223. See, Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755.

Moreover, the extent to which dementia præcox may be permanent is not made perfectly clear in the testimony of the witnesses. While there is shown to be a certain amount of permanency in the disease, the doctors all, using different words to express it, agree that there are "remissions" in it, or, as one says, it is "cyclic"; another that "mentally they will gain, and mentally get well, we will say," but "it is present all the time," and "considered as recurrent."

We think that it would have a misleading tendency to charge that it is permanent.

■ Assignments 11 and 12. On cross-examination of defendant's wife in respect to the sanity of defendant, the court allowed her to say that he had been sentenced to the penitentiary at Montgomery for assault with a weapon "9th and 5th of 1933." The court stated that it was admitted only on the question of defendant's sanity.

This issue gives much latitude to the defendant and the State to introduce evidence of defendant's acts, declarations and conduct prior and subsequent to the alleged crime. Anderson v. State, 209 Ala. 36, 95 So. 171; Birchfield v. State, 217 Ala. 225, 115 So. 297; Deloney v. State, 225 Ala. 65, 142 So. 432.

There was no error in the ruling.

Assignment 14. We fail to find in the bill of exceptions an exception to the oral charge as set out in this assignment.

■ Assignments 15 and 16. It is the settled law that the general bad character of an adversary witness may be shown to impeach him, and it is not limited to character for truth and veracity. 19 Ala.Dig. 799, Witnesses, ☞337(2).

We have carefully examined the recitals of the bill of exceptions in this connection, and have reached the conclusion that they do not show prejudicial error.

■ Assignments 7, 8, 9 and 10. They show that appellant offered to prove that a State's witness had been convicted fourteen times in the recorder's court for drunkenness and disorderly conduct. This was offered for impeachment purposes.

This contention finds no support in section 7722, Code, since the conviction involves no moral turpitude. Marshall v. State, 207 Ala. 566, 93 So. 471; Baugh v. State, 215 Ala. 619, 112 So. 157; 19 Ala. Dig. 809, Witnesses, ☞345(2).

■ Moreover, the statute which permits the impeachment of a witness by proof of a conviction for a crime involving turpitude only applies to violations of State laws, not for violations of municipal ordinances. 19 Ala.Dig. 808, Witnesses, ☞345.

Appellant relies on the case of Lowman v. State, 161 Ala. 47, 50 So. 43, 44, where a witness had testified to the good character for truth and veracity of defendant, and it was held that the State on cross-examination could question the witness whether he had heard that defendant had been accused of selling liquor. This Court observed that under such circumstances, the witness could be questioned as to what he had heard likely to affect the character of the witness sought to be impeached, and stated further that "Repeated violations of statute law will doubtless affect general character, which, when made the subject of proof in courts of justice, means the estimate in which one is held by the community," though they may not involve moral turpitude.

But that principle does not open the door to proof of such violations as direct evidence of bad character, and it is not so stated in that case.

We find no reversible error, and the judgment is affirmed.

Affirmed.

ANDERSON, C. J., and THOMAS and BROWN, JJ., concur.

On Rehearing.

BROWN, Justice.

The defendant, a World War veteran, who has spent much of his time, since the World War, in asylums and hospitals, on account of his mental status, was tried and

convicted of murder in the first degree and sentenced to the penitentiary for life.

The evidence is without dispute that defendant and his wife were in the City of Birmingham shopping; that she gave him money to go to another store to pay a bill, but instead he went to a restaurant where he came in contact, without prearrangement, with a young woman he had never seen before, and on her suggestion they went to the home of deceased in a taxicab, where defendant for the first time met deceased and deceased's wife and a Miss Gilly; that all went into deceased's house on invitation, and all except deceased drank whiskey out of a pint bottle of whiskey which appellant and his companion carried to the house. The deceased and Miss Gilly went on the porch and sat in the swing, deceased declining to drink, the others remaining in the kitchen. Soon thereafter, deceased's wife came out of the house on to the porch and stated to her husband that appellant had torn her dress and slapped her down. From this incident a sudden rencounter ensued, between defendant and deceased, in which defendant cut Hammett, the deceased, across the abdomen, making an incision some six inches or more in length, causing his intestines to come out into his shirt. Hammett died thirty days later from peritonitis incident to the wound.

The weight of the evidence goes to show that the defendant is mentally abnormal, and much tended to show that he was suffering from a disease of the mind. The weight of the evidence goes to show that defendant was afflicted with an irresistable craving for intoxicating liquors, and when under its influence is criminally insane.

The case went to the trial on the plea of not guilty, and "not guilty by reason of insanity," and while it may be conceded that the evidence afforded an inference that defendant's act in cutting Hammett was deliberate and premeditated, it would be more nearly correct to say that such finding is based on mere conjecture.

The legal test of accountability, under the plea of not guilty by reason of insanity, is the mental ability, at the time of the commission of the crime, to discriminate between right and wrong in respect to the offense charged in the indictment, with the ability to refrain from doing wrong. Parsons v. State, 81 Ala. 577, 2 So. 854, 60 Am.Rep. 193; Boyle v. State, 229 Ala. 212, 154 So. 575.

Ordinarily, under similar facts and circumstances attending the commission of the offense—the question of insanity aside—the trial would probably have resulted in a verdict of murder in the second degree. The severity of the punishment inflicted, is, in the opinion of the writer, attributable to the looseness with which the trial was conducted and a mass of illegal and immaterial evidence brought into the case by the state, some of which was received without objection by the defendant or his counsel.

The state was allowed to show, over defendant's timely objections, that deceased's wife was dead; that she died since the rencounter between the defendant and deceased, of pneumonia. The evidence was clearly immaterial and had a tendency to engender sympathy for the deceased and excite prejudice against the defendant. Its effect on the jury can not be estimated. Blevins v. State, 204 Ala. 476, 85 So. 817.

The state's expert witness, Dr. Kay, was without objections, not only allowed to give his opinion, from his examination, observation and knowledge of defendant, of the defendant's insanity in general, but was allowed to give a second-hand rendition of the conclusions of the members of the board of physicians of the Bryce Hospital to the effect that the defendant was sane. To quote: *"It was the unanimous opinion of the medical staff that Mr. Grammer was not insane,* at all conferences that discussed it. That was based on our review of the history of the case, his behavior in the hospital our examinations of him and our observations of him during the time he was in the hospital. The staff notified Dr. Partlow, or *gave him the record.* Dr. Partlow is the administrative head of the hospital—the superintendent. And when we had disposed of the case and recommended his return to the court as not being insane, then Dr. Partlow wrote a letter based upon that information, to the effect that he was not insane and should be returned to the court for their further disposition. There were seven physicians and the clinical director on the staff conference. Not all are present at all times at these conferences. There were six present at the first conference; there were seven present at the last conference, the ones that finally decided, after all of our observations, that he was not insane and recommended his return to the court. * * * Yes, I have the letter that was written to the Judge, or the Solicitor, I am

not sure which. Here is the letter to the Judge. And another letter a little more descriptive. * * * I believe, though, *like many people,* that he doesn't always take into consideration the price he has to pay for the things he does, and particularly when drinking; and, according to the history, he drank often, and he was most dangerous and vicious in his reaction; and it was my feeling *and the feeling of the rest of the medical staff* that, while he was not insane, *he was such a character that it wouldn't be safe to release him upon society; and that whenever he drank that that potential menace was still present."* [Italics supplied.]

Much of this testimony was not only second-hand, mere hearsay, but the right to test the competency of the other persons participating in the conferences, and the right of cross-examination was denied. The utterances of the witness last above italicized, constituted the witness Judge and Jury, and no doubt went far in influencing the jury in returning a verdict of murder in the first degree.

The defendant did not testify as a witness, nevertheless, the court, over timely objections, allowed the state on the cross-examination of the defendant's wife, who did testify as a witness in his behalf, to bring into the case an impossible fact— that the defendant was convicted in Montgomery, some five or six years previous to the offense for which he was on trial, *for an assault with a weapon and sentenced to the penitentiary.* And it was developed before the court's final ruling on the question, that the witness's only knowledge in respect to the matter was hearsay. This testimony in no way affected the credibility of the witness's testimony and shed no light on the question at issue between the parties—whether or not defendant was sane at the time he cut Hammett. Its only effect was to prejudice the jury against the defendant, and no doubt to some degree influenced the verdict for murder in the first degree.

To my mind, the verdict finding the defendant guilty of murder in the first degree is contrary to the great weight of the evidence, and the court erred in denying the motion for new trial.

For the errors noted, the judgment should be reversed.

FOSTER, Justice.

 Justice BROWN seems to declare that it was reversible error to show that the wife of decedent, Hammett, was dead at the time of the trial. But aside from the fact that no point was made by appellant's counsel in brief or assignments on account of that ruling, it is not erroneous when we consider the fact that she was present at the time of the occurrence, and that the difficulty was directly concerning the alleged treatment of her by defendant at that time. If the State did not produce her as a witness, it was not error to account for her absence by showing her death prior to the trial.

The only questions argued on this appeal relate to the plea of insanity.

Justice BROWN seems to rely for his conclusion, that the verdict and judgment should be set aside, on the fact that much of the evidence of Dr. Kay, an expert on mental disease connected with the Bryce Hospital, was a second hand rendition of the conclusion of members of the staff of physicians of the hospital.

 Aside from the fact that no objection was made to it, it appears that those conclusions were expressed in their conferences and examinations of defendant, where, in many of them, he was personally brought to make a diagnosis, and in others they were considering and discussing his symptoms. When so, the opinions expressed by the physicians have been held by this Court, in line with others, to be a part of the res gestæ of their diagnosis and that of the physician testifying, since they were thus engaged in their professional service, and the expression of such opinions "were coincident business declarations," and admissible in evidence though given in the testimony of another witness. Franklin Life Ins. Co. v. Brantley, 231 Ala. 554, 165 So. 834; Taylor v. Atlantic Coast Line R. Co., 232 Ala. 378, 168 So. 181; Mutual Life Ins. Co. v. Tillman, 84 Tex. 31, 36, 19 S.W. 294, 297. The fact that the witness expressed the "unanimous opinion of the medical staff", rather than a repetition of what they said in that connection is not sufficient, in the absence of objection on that ground, to impeach such testimony of Dr. Kay as not being of much probative value. Whether he should have been required to repeat what each doctor said in substance, or to give it as Dr. Kay did, was a matter which defendant and his

counsel could control by making objection or not as they should elect. They made no such objection, and therefore, it is not the province of this Court to minimize the effect of it as given by the witness.

It is also insisted that the judgment should be reversed because on cross-examination of defendant's wife, and limited to the question of insanity of defendant, she was allowed in answer to a question by the State to testify that he was convicted in Montgomery September 5, 1933, of an assault with a weapon, and sentenced to the penitentiary. Later, in that connection, it was brought out by her testimony that he cut a man named Deeton, was found guilty, and a fine and costs taxed, but not paid, and for which he was sentenced. While she said he was sent to the penitentiary, it is probable she did not know the difference between the penitentiary and hard labor for the county. She also testified that defendant and her father had had a shooting affair, but neither was hit. No objection was made to this evidence. She seemed to think it tended to show his insanity, but objection was made to the Deeton incident, and the conviction in Montgomery. The grounds of objection were general. The court confined it to the issue of insanity. On that issue, we have said it "gives much latitude both to the defendant and to the state to introduce evidence of defendant's acts, declarations, and conduct, not only at the time of the offense, but prior and subsequent thereto." Anderson v. State, 209 Ala. 36, 95 So. 171, 175; Birchfield v. State, 217 Ala. 225, 115 So. 297; Deloney v. State, 225 Ala. 65, 142 So. 432.

The effect of the testimony of this witness was that at that time, in 1933, defendant was insane. Such affairs as he had with her father and with Deeton, for the latter of which he was convicted and fined and sentenced in default of payment, have a bearing on the issue in that connection, and on her cross-examination at least, were admissible.

Application overruled.

GARDNER, THOMAS, and KNIGHT, JJ., concur.

ANDERSON, C. J., and BOULDIN and BROWN, JJ., dissent.

BROWN, J., has expressed his views; ANDERSON, C. J., and BOULDIN, J.,

concur in the dissent of BROWN, J., only to the extent he holds that there should be a reversal because the wife of defendant on cross-examination was allowed to testify to the conviction of defendant in Montgomery of an assault with a weapon, and sentenced to the penitentiary. In other respects they concur in the majority opinion, by which the application for rehearing is overruled.