Gregory Michael Bass, the appellant, was convicted for intentional murder and was sentenced to life imprisonment. He was also convicted of three cases of assault in the first degree and was sentenced to 15 years' imprisonment in each case. He raises eight issues on this appeal from those convictions.
 I.
The appellant argues that his motion for a directed verdict should have been granted because the evidence of his insanity was so overwhelming and uncontradicted that it overcame the presumption of sanity.
On the morning of April 11, 1989, the appellant shot four people with a shotgun for no apparent reason. The appellant first shot his wife, Linda Morrison Bass, inside their residence. Mrs. Bass ran out of the house to a garbage truck seeking aid. The appellant followed her and separately shot three employees of the Dothan Environmental *Page 227 
Services Department: Stanley Smith, Kenneth Hadley, and the appellant's uncle, George Bass. Smith was killed by the shotgun blast. Mrs. Bass, George Bass, and Hadley each sustained serious physical injury.
Linda Morrison and the appellant were married on February 13, 1989. They lived together with Mrs. Bass's four children by a prior marriage. She testified that the appellant never indicated to her that he was under treatment at Wiregrass Mental Health or that he had ever been treated at Searcy Hospital or Taylor Hardin Secure Medical Facility. The appellant had been employed as a laborer at Stanley Brick Masonry for approximately eight months and received a social security check for mental disability. The check was in the name of Catherine Bass, the appellant's sister. The check was delivered to the residence of the appellant's mother.
From 1987, when she began dating the appellant, until April 11, 1989, Mrs. Bass never saw the appellant take any medication. She "felt" like he knew the difference between right and wrong at the time of the shooting.
Mrs. Bass had purchased a 12-gauge shotgun because the appellant wanted to take her hunting and because the appellant said she needed protection. The shotgun was kept in the trunk of Mrs. Bass's car because the appellant did not want the children to have access to it.
On April 10, 1989, the day before the shooting, Mrs. Bass, Catherine, and the appellant went to Birmingham to pick up the appellant's niece from the hospital. On the return trip, the appellant suggested that "we have his checks signed back over to his mother." The appellant felt that he and his wife should be separated so he could live with and take care of his mother. However, this upset Mrs. Bass's daughter and the appellant said he would stay. Mrs. Bass testified that prior to April 11, there were discussions between herself and the appellant and the appellant's family concerning financial problems.
Mrs. Bass testified that on April 10, 1989, the appellant "was very nervous at the time." There were times that night when the appellant "would be a different person every fifteen minutes," and that night his personality changed "on a regular basis" — "one moment he would be very quiet and the next minute he would be real volatile."
On the morning of April 11, 1989, when Mrs. Bass awoke, the appellant had shaved his hair "to the scalp" and was rubbing machine oil on his head. The appellant told Mrs. Bass that he needed to talk with his cousin, Reverend Walter Goyens, and that he was going to go back to church and get back to the Lord.
At 5:00 on the morning of the shootings, April 11, 1989, the appellant telephoned his cousin, the Reverend Goyens, and stated that he needed to talk to him. The appellant called again at 5:30, and Reverend Goyens came to get the appellant in his automobile. When the appellant left his residence, he pulled the telephone from the wall and took it with him. Mrs. Bass testified that the appellant "was going to have it transferred to his mother's house, and then he decided that he would have a refund on it and take it back and get a refund."
Rev. Goyens testified that the appellant was upset because Mrs. Bass had put her name on one of his Social Security checks. Goyens took the appellant to the Dothan Housing Authority, where the appellant hit a white man in the eye for no reason. Goyens testified that at this time the appellant appeared to be "in a daze of some kind."
Mrs. Bass testified that the appellant returned home around 11:00 with his sister Mary Bass. Mary wanted the appellant's Medicaid card. The appellant, who was not usually quiet, was very quiet and was smiling. Mary and the appellant left. The appellant then returned with Mary and his cousin. Mrs. Bass testified that "Mary had given him some medicine and she had taken him to the doctor to see Dr. Lopez." Contained in the social history-relative interview dated May 31, 1989, conducted by Taylor Hardin Secure Medical Facility staff *Page 228 
social worker, Carol E. Williams, is a statement given by Mrs. Bass to Ms. Williams:
 "[Mrs. Bass] also indicated that on the morning of the incident, the landlord, who was employed at the Section 8 office, visited her home regarding her rent. She stated that the patient then became extremely agitated and following the employee's return to the resident manager's office, the patient then went to the office and brutally assaulted the male employee. She stated that following this assault, the patient's sister, Mary, picked him up and took him to Dr. Lopez's office. She stated that the patient's sister then gave him some medication previously ordered by the doctor. The informant indicated that the patient then became 'groggy' and returned home. She then noticed that the patient's paranoia continued."
Ms. Williams also reported that according to Mrs. Bass, the appellant "discontinu[ed] his medication regimen at the end of 1987 or the beginning of 1988."
When the appellant returned home that day, Mary told Mrs. Bass that the appellant needed to sleep. However, the appellant wanted something to eat and Mrs. Bass fixed him a sandwich. The appellant asked her if she had put anything in the sandwich and would not eat. The appellant was afraid she would poison or "hurt" him.
The appellant's uncle, George Bass, drove a garbage truck. On the morning of April 11 he was working in the appellant's neighborhood. Working with him were Bruce Stanley Smith and Kenneth Hadley. The appellant went outside and had a conversation with his uncle. George Bass testified that the appellant "acted like he was all right" at that time. When the appellant returned inside the house, he asked Mrs. Bass if she had removed the gun from the trunk of the car. The appellant got the shotgun out of the truck and walked to the bedroom. Mrs. Bass testified that the appellant was not acting any differently from the way he usually acted.
Around 11:00 that morning, Mrs. Bass was sitting in the den napping. The appellant walked in, looked at her, and said, "You fucked up now," and shot her. Mrs. Bass was hit in the right breast. She asked him why he shot her and the appellant never answered. Mrs. Bass ran outside to the garbage truck driven by George Bass. She asked a white garbage worker named Smith "for permission to get in the bin of his truck." Smith said that he could not help her, but that she could crawl in the back.
The appellant followed his wife to the garbage truck. Hadley testified that he saw the appellant standing in his yard and that the appellant "pointed at [Hadley] to come to him, toward him." Hadley then got in the cab of the truck. As the appellant walked along the side of and toward the rear of the truck, George told the appellant, "Hey man, give me that gun." The appellant responded, "I can't — I ain't going to give you the gun because you might shoot me with it, or something." The appellant walked to the side of the truck and shot Smith in the left side of the face. Smith died the next day. The appellant returned walking, not running, to the front of the truck where he raised the shotgun and without any comment shot George Bass in the right shoulder. George fled the truck and ran to another street. George Bass testified that at the time of the shootings, the appellant knew the difference between right and wrong "from as far as [he] kn[e]w he could."
Hadley was sitting in the passenger's seat of the truck and heard the appellant say "something about, kill every damn one of y'all." After shooting George Bass, the appellant then shot Hadley, who was still sitting in the truck. Hadley was struck on the right side of the face. The appellant then walked back to his residence.
Dothan Police Lieutenant Draught told the appellant to come out and nobody would hurt him. The appellant stuck his head out the door, saw someone raise a shotgun, and then went back in. Lieutenant Draught called to the appellant again, and the appellant came out and was arrested. Sergeant Jackie Mendheim testified that, when the appellant was informed that he was under arrest for assault, the appellant *Page 229 
stated that he needed a cigarette and said, "I shot them and I'll pay the hospital bills." Mendheim testified that in his opinion the appellant "knew what he had done."
Dothan Police Sergeant Jim Stanley arrived on the scene around 11:10 that morning. He transported the appellant from the scene of the shootings to the police department. He testified that, "considering the circumstances and everything, he was pretty calm." On the way to the station, the appellant voluntarily and spontaneously made several comments. According to Sergeant Stanley, the appellant said that he "wanted to join the police department"; "I guess I'll get life without parole for this"; and "I shot her, but she is okay. I didn't hurt her." The appellant also said, "I got tired of her picking on me and I just couldn't take it any more."
At police headquarters, Detective Louis Miller was dressed in civilian clothes. The appellant asked if he were an attorney and said that he wanted to see an attorney.
Barbara Ann Carol Yates was a registered nurse in the Houston County jail. She first saw the appellant on April 12, 1989, the day after the shooting. At that time, she "couldn't keep [the appellant] on task long enough to talk enough to get a medical history," and could not get the appellant to understand her questions. The appellant "couldn't be still. He was constantly talking" and "just kept on talking about meeting a doctor." The appellant was placed on medication (Mellaril and Cogentin) on April 13. He was isolated in a single cell. Twenty-four hours after the appellant started his medication, he "calmed down" and nurse Yates could talk to him. She obtained a medical history from the appellant on April 14. She also indicated that the appellant "had his medication at home."
There was testimony that Mellaril is an antipsychotic medication which initially acts as a tranquilizer and sedates the individual to calm him down. The antipsychotic effect happens later on, two to four weeks after taking the medication. Cogentin is given to neutralize the side effects (tremors and shaking) of Melloril.
Nurse Yates testified that just before the appellant was transferred to Taylor Hardin on May 8, 1989, the appellant was not loud or agitated and did not need to be restrained to protect himself.
Brenda Wright was a licensed practical nurse at the Houston County jail. She first saw the appellant at the jail on April 18. She testified that the appellant "was cooperative at times, and sometimes he wasn't. He was confused." Nothing in her records reflected that the appellant was a threat to himself or to anyone else while he was in the jail.
Leon Baxter was the assistant chief warden at the Houston County jail. He was with the appellant on April 12, 1989. The appellant was in a one-man cell. He was "beating on the bars and on the cell door and slinging things around." Baxter told the appellant to sit down because he needed to talk to him. The appellant obeyed, and Baxter informed the appellant that he would be placed on restriction and placed in a holding cell if his disruptive conduct continued. Baxter testified that he "had no more problem with him after that, and later on we took him and we put him in the population with the other inmates."
The appellant was transferred from the Houston County jail to the Taylor Hardin Secure Medical Facility on May 8, 1989 — 27 days after the commission of the crimes. He remained there until July 31, 1989. The appellant received a mental status examination upon admission and the examiner concluded: "Psychotic Disorder by History, however, currently there was no evidence of a formal thought disorder." At the time of his discharge to Houston County "all psychotic symptoms had diminished or were resolved. Mr. Bass did not exhibit any major management problems." The appellant's condition was diagnosed as "chronic paranoid schizophrenia, in remission". A mental status examination dated May 8, 1989, by staff psychiatrist Ronald L. Jackson, states: *Page 230 
 "The [appellant's psychiatric] history sounds consistent with some psychotic disorder. Over the past year he has been followed by the Mental Health Center in Dothan and treated with a regimen of Mellaril and Cogentin. He reports his last visit to the mental health center was one year ago. However, he reports that he continues to take his Mellaril and Cogentin."
"Impression:
 "Psychotic Disorder by history, however, currently there is no evidence of a formal thought disorder."
A patient interview dated May 18, 1989, by Carol E. Williams, staff social worker, contains the following:
 "He stated that he maintained follow-up visits with the Wiregrass Mental Health Center approximately twice per month. He stated, however, that he stopped maintaining contact with this mental health center for the previous three months. . . . He did indicate that he was receiving Mellaril as well as Cogentin at that time."
In a forensic evaluation report by psychiatrist Bernard E. Bryant dated July 25, 1989, it is stated:
 "The patient, himself, admits to voluntarily stopping the medication approximately two months prior to the alleged crime. He stated to this examiner that he was experiencing command hallucinations stating that a white man was going to kill him so he would have to kill this white man before the tables were turned on him. . . . In this examiner's opinion, the patient probably was experiencing some psychotic symptoms at the time of the alleged crime. . . . [T]he present investigation revealed evidence of some psychotic symptoms in the patient at the time of the alleged crime."
Psychologist Kathleen Ann Ronan Rogers was a "team leader" for a portion of the appellant's hospitalization at Taylor Hardin. She saw the appellant initially on June 15. She testified that "schizophrenia is probably the most serious of the thought disorders," and its main symptom is "a disintegration or disorganization of the thought processes." She stated, "For anyone who has shown the psychotic and schizophrenic symptoms for more than two years, they would be considered to be chronic. Chronic means that this is a condition that has gone on for a long time and probably will go on for a long time." She testified that there is not a cure for schizophrenia but that "the symptoms can be held in remission or controlled through the use of medication, but as of this point in time there is no known cure for schizophrenia." According to Dr. Rogers, immediately before the appellant was admitted and while he was in the county jail, he was seen by Dr. Lopez, who found the appellant to be "incoherent and agitated and grossly psychotic." The appellant was admitted to and remained in the acute care unit until May the 24, when he was transferred to the structured living program because it was evident that he was not going to be stabilized within a 30-day period. Dr. Rogers testified:
 "From the documentation Mr. Bass came in and in both of the evaluations he seemed to be pretty stable at the time that he was admitted. He wasn't showing the loose associations. He wasn't reporting any hallucinations at that point. However, in my review of the documentation within the first week or so of his admission, he — he did have times when he was delusional when he thought he had been kidnapped and was real angry. He was — his behaviors seemed to be out of control. He got very agitated and attacked a couple of other patients without any kind of provocation. He had to be physically restrained and separated from attacking another patient, and at one point he had to be secluded and this was pretty consistent from his prior hospitalizations. There — there had been times when he was secluded. Secluded means placed in a room where someone cannot injure themselves or injure anyone else. . . . And he was secluded on the 23rd, I believe, after he was admitted, about two and a half weeks after he was admitted."
Dr. Rogers testified that the appellant's delusions were "transient. In other words, *Page 231 
they kind of — they would come and go," and were of fairly short duration at that time.
Dr. Rogers testified that the appellant "had failed to come in for appointments despite some attempts to get him in to his appointments as of December 9, 1988."
Dr. Rogers could not tell whether the appellant exhibited psychotic symptoms on the date of the shootings.
There was evidence that the appellant had a prior history of marijuana abuse. Laura Shevlin, a toxicologist for the Alabama Department of Forensic Sciences, testified that she received a blood sample from the appellant dated April 11, 1989. Laboratory analysis revealed the blood specimen to be negative for ethyl alcohol, cocaine, and other basic drugs, and for barbiturates and other acidic and neutral drugs. The test did not include marijuana which is not readily detected in the blood. Mellaril, Thorazine, or Cogentin were not found to be present.
Psychiatrist Fernando Lopez testified that if a person were on medication for paranoid schizophrenia and stopped taking the medication "within a period of six to twelve weeks a recurrence of the complete set of symptoms and signs will appear." In his opinion, the appellant was suffering from a mental disease identified as chronic schizophrenic with paranoid features. Dr. Lopez testified that on April 12, 1989, the date of the shootings, the appellant had "a recurrence of his illness." He testified that the appellant exhibited psychotic symptoms on the day of the alleged offense and prior to that time.
Dr. Lopez also testified that the appellant had not been keeping his appointments at the Wiregrass Mental Health Center in 1988 and was not taking his medication. He started the appellant on medication while the appellant was in the Houston County jail following his arrest.
Psychiatrist Bernard E. Bryant was employed at the Taylor Hardin Secure Medical Facility, where he prepared a forensic evaluation report on the appellant. He examined the appellant on July 25, 1989, and concluded that the appellant "probably was experiencing some psychotic symptoms at the time of the alleged crime." He testified that "[a]t the time of the defendant's admission . . ., he was experiencing auditory hallucinations, exhibiting bizarre behavior, and had feelings of suspiciousness towards all individuals." The appellant was psychotic at the time of his admission. The appellant was "experiencing command auditory hallucinations at the time of the crime," and was suffering from psychotic symptoms at the time of the crime. The appellant was suffering from a mental disease or defect which Dr. Bryant characterized as "a severe one" and was "in need of constant treatment." Dr. Bryant testified that, as a result of this mental disease, the appellant was unable to appreciate the nature and quality of his acts. He testified that "it is possible for a person diagnosed as suffering from paranoid schizophrenia to know right from wrong and appreciate the nature and quality of his conduct; but . . . this depends on the severity of the illness." "All mental patients have lucid periods."
 "In this examiner's opinion, the patient first started experiencing psychotic symptoms in 1979; and these symptoms have persisted to the present date. They only appear to abate and exacerbate depending on the amount of medication the patient has in his system.
 "In this examiner's opinion, the patient did not [sic] experience psychotic symptoms on the day of the offense. He had experienced them prior to these events.
". . . .
 "In this examiner's opinion, the psychotic symptoms afflicting the patient continued through the commission of the crime and probably exist at the present time.
 "It's possible for the psychotic symptoms to abate, but not disappear at any time. Paranoid schizophrenia is not cured. It's just treated."
The appellant told Dr. Bryant that at the time of the shootings he was hearing voices directing him to kill a white man.
Mrs. Bass also testified that the appellant was often afraid that someone was *Page 232 
listening to his telephone conversations and was outside his house watching him. He was jealous over Mrs. Bass's ex-boyfriend, "Big Will" Glanton, who had raped Mrs. Bass, and would stand across the street from her workplace and watch Mrs. Bass at work. The appellant liked to collect hats, shoes, and sunglasses, and liked to make sure that they all matched. The appellant was very superstitious. The appellant kept all of his old clothes, once made strange mimicking noises while watching T.V., and once said he could beat up boxer Mike Tyson. The appellant had lost a lot of weight between November 1988 and April 1989. He had stopped eating and would not sleep regularly, sometimes staying up all night.
William Griffin, the father of Mrs. Bass's four children, had told Mrs. Bass that the appellant had mental problems.
After the appellant's arrest and while he was at Taylor Hardin, the appellant telephoned Mrs. Bass and told her "that he was ill and that he was sorry for what had happened, but he was sick . . . and he said, well, as soon as he got out he would come back and help me [with the financial problem]." She testified that he said that he "would go back to work and catch up on my bills that I couldn't afford."
The defense introduced documentation that the appellant had been committed, pursuant to civil proceedings in the Probate Court of Houston County, to the custody of the Alabama Department of Mental Health in 1980, 1982, and 1983. In the commitment order dated October 7, 1983, the probate court found:
 "Mr. Bass is diagnosed as Schizophrenia Chronic Undifferentiated. He has recently ceased taking his medication and has consequently become unstable. He has failed to take his medication and has not cooperated with the Wiregrass Mental Health Clinic in taking the necessary medication."
The appellant was initially admitted to Searcy Hospital on November 19, 1980, and was released on April 3, 1981, with a diagnosis of schizophrenia, undifferentiated. "At the time of release [the appellant] was in good remission of medication."
The appellant was admitted to Searcy Hospital a second time on April 30, 1982, and was released on October 2, 1982, with a diagnosis of schizophrenia, undifferentiated, chronic with acute exacerbations. "At the time of release, [the appellant] appeared to be in remission on medication [Thorazine and Cogentin]."
The appellant was admitted to Searcy Hospital a third time on October 11, 1983, and was released on July 12, 1984, with a diagnosis of schizophrenia, paranoid, chronic. "At the time of his release from Searcy Hospital, [the appellant] was stable and non-psychotic on medication [Mellaril, Cogentin, and Benadryl]. . . . His prognosis is considered good with medication and other supportive resources from the community."
In Ware v. State, 584 So.2d 939 (Ala.Cr.App. 1991), this Court observed:
 "In 1988, the Alabama legislature replaced our insanity defense statute by enacting the 'Reasonable Insanity Test Act of 1988,' 1988 Ala. Acts 1051, No. 88-654, now codified at Ala. Code § 13A-3-1 (Supp. 1990). Subsection (a) of that statute provides that:
 " 'It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.'
 "Section 13A-3-1(a) is virtually identical to the federal insanity defense statute, 18 U.S.C. § 17(a) (1988), which 'was passed in the wake of John Hinckley's acquittal of charges arising from his actions in shooting President Ronald Reagan and Press Secretary James Brady.' United States v. Cameron, 907 F.2d 1051, 1061 (11th Cir. 1990).
 "The new Alabama and federal insanity statutes represent a significant change from the insanity defenses previously available in criminal trials. Formerly, *Page 233 
a defendant was not responsible for his criminal acts if 'at the time of such conduct as a result of mental disease or defect he lack[ed] substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.' Ala. Code § 13A-3-1(a) (1982 Replacement Vol.); United States v. Freeman, 357 F.2d 606, 622 (2d Cir. 1966). It is clear that the new § 13A-3-1(a) is 'substantially more restrictive' than its predecessor section. United States v. Brown, 899 F.2d 189, 192 (2d Cir. 1990) (comparing 18 U.S.C. § 17(a) to the predecessor defense recognized in federal courts). Where the original § 13A-3-1(a) had both a 'cognitive' test (lack of capacity to appreciate the criminality of the conduct) and a 'volitional' test (lack of capacity to conform one's conduct to the requirements of the law), the new § 13A-3-1(a) has only a 'cognitive' test (inability to appreciate the nature and quality or wrongfulness of one's acts). See United States v. Brown, 899 F.2d at 192; United States v. Cameron, 907 F.2d at 1061.
 "While the new § 13A-3-1(a) contains only the 'cognitive' test, the defendant must make a two-part showing to meet this test. 'First, he must establish that he suffered from a serious mental disease or defect at the time of the crime. Second, his mental disease or defect must have prevented him from appreciating the nature and quality or wrongfulness of his acts.' United States v. Knott, 894 F.2d 1119, 1121 (9th Cir.), cert. denied, ___ U.S. ___, 111 S.Ct. 197, 112 L.Ed.2d 158 (1990) (citations omitted) (emphasis added). The defendant must prove both prongs of this test 'by clear and convincing evidence.' § 13A-3-1(c) (Supp. 1990).
 "While new § 13A-3-1(a) contains a much more restrictive definition of insanity than that under which we previously operated, the general principles of law regarding the defense of insanity remain unchanged. Those principles have been summarized as follows:
 " '1. By statute, there is a presumption of sanity extending to all persons over the age of 14.
 " '2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the state.
 " '3. The burden upon the defendant is to establish the issue of legal insanity by a preponderance of the evidence and to the reasonable satisfaction of the jury.
 " '4. The question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence.
 " '5. In making its determination, the jury may reject all expert testimony though it is without conflict.
 " '6. However, opinion testimony, even of experts, must be weighed by the jury and may not be arbitrarily ignored.
" '. . . .
 " 'The one exception to these rules is found in those cases where the proof of insanity is overwhelming and uncontradicted.
 " ' "Cases of insanity may be so clear, the proof so strong and undisputed, that the jury should be instructed in like form." Boyle v. State, 229 Ala. 212, 222, 154 So. 575, 583
(1934).'
 "Herbert v. State, 357 So.2d 683, 688-89
(Ala.Cr.App.), cert. denied, 357 So.2d 690 (Ala. 1978). See also Christian v. State, 351 So.2d 623, 624-25 (Ala. 1977); Ellis v. State, 570 So.2d 744, 749-753 (Ala.Cr.App. 1990)."
". . . .
 " 'In order for this court to reverse [a guilty verdict on the ground that it is contrary to the weight of the evidence of insanity, the] evidence of insanity must be "overwhelming," "uncontradicted," and "clear, . . . strong and undisputed." ' Sistrunk v. State, 455 So.2d 287, 289 (Ala.Cr.App. 1984) (citations omitted). As noted above, this evidence must establish that, at the time the offense was committed, *Page 234 
(1) the defendant was suffering from a severe mental disease or defect and (2) that this disease or defect resulted in the defendant's inability to appreciate the nature and quality or wrongfulness of his actions. § 13A-3-1(a) (Supp. 1990)."
584 So.2d at 942-945 (emphasis in original).
Applying these principles to the facts of this case, we find that the issue of the appellant's insanity was properly submitted to the jury.
The appellant presented three experts. Dr. Rogers could not testify as to whether the appellant exhibited psychotic symptoms in relationship to paranoid schizophrenia on April 11, 1989, because she did have all the information available. Dr. Lopez testified that the appellant exhibited psychotic symptoms prior to and on the day of the shootings. Dr. Bryant testified that the appellant was "probably" experiencing command auditory hallucinations, that he was suffering from psychotic symptoms at the time of the crime, and that he was suffering from a mental disease or defect and that as a result he was unable to appreciate the nature and quality of his acts at the time of the crime. However, both Dr. Lopez and Dr. Bryant indicated that it was possible for a person diagnosed as suffering from paranoid schizophrenia to know right from wrong and to appreciate the nature and quality of his conduct.
"Evidence of commitments to hospitals for mental and psychological reasons is insufficient, in and of itself, to establish that the accused was legally insane at the time the crime was committed." Turner v. State, 455 So.2d 907, 909
(Ala.Cr.App. 1983), reversed on related ground, 455 So.2d 910
(Ala. 1984). "Even where it is shown that an individual is subject to spells of insanity, the law presumes that the crime he committed occurred during a lucid interval." Westbrooks v.State, 492 So.2d 1023, 1025 (Ala.Cr.App. 1984).
 " 'There is no presumption that fitful and exceptional attacks of insanity are continuous — a proposition manifest in itself. It is only insanity of a chronic or permanent nature which, on being proved, is presumed to continue. — Whart.Cr.Ev. Section 730. The rule, therefore, prevails that where an insane person "has lucid intervals, the law presumes the offense of such person to have been committed in a lucid interval, unless it appears to have been committed in the time of his distemper." — 1 Russell on Cr. 11; 1 Hale, 33-4.' Ford v. State, 71 Ala. 385, 395
(1882)."
Lewis v. State, 439 So.2d 1357, 1358 (Ala.Cr.App. 1983).
 "[I]t is a sound general rule that insanity at any particular time, if shown to be habitual and permanent in its nature, is prima facie presumed as a matter of law to exist at any future time; and alone from its existence at a later time a presumption of fact may arise of its existence at a given prior time. But in the latter case it is clear that the probative value of subsequent insanity to show insanity at any prior time will depend upon (1) the nature and degree of the insanity shown, and (2) its nearness or remoteness in point of time to the act under consideration."
Odom v. State, 174 Ala. 4, 9, 56 So. 913, 915 (1911) (citations omitted). See also Benton v. State, 31 Ala. App. 338, 343,18 So.2d 423, 428, cert. denied, 245 Ala. 625, 18 So.2d 428
(1944); Cogbill v. State, 8 Ala. App. 223, 227, 62 So. 406, 407
(1913).
 "Under the statute the burden was on defendant to show that at the time of doing the act, he was incompetent to control himself, though he may have had a permanent form of insanity, if in such condition there were times when he was competent to know right from wrong, and control his actions.
 "When there is proof of such intervals of lucidity, the principle that a permanent form is presumed to continue (Odom v. State, 174 Ala. 4, 56 So. 913) does not mean that there is a presumption against the idea that he may have acted in a lucid interval. Talbert v. State, 140 Ala. 96, 37 So. 78."
Grammer v. State, 239 Ala. 633, 637, 196 So. 268, 271 (1940). *Page 235 
George Bass testified that the appellant appeared "just like he was all right" on the day of the shooting. Other prosecution witnesses testified that the appellant knew right from wrong at the time of the shootings.
The appellant's last admission to Searcy Hospital was on October 11, 1983. He was released on July 12, 1984, with a diagnosis of Schizophrenia, paranoid, chronic. "At the time of his release from Searcy Hospital, [the appellant] was stable and nonpsychotic on medication [Mellaril, Cogentin, and Benadryl]. . . . His prognosis is considered good with medication and other supportive resources from the community." When the appellant was admitted to Taylor Hardin Secure Medical Facility on May 8, 1989, following the shooting a mental status examination concluded: "Psychotic Disorder by history, however, currently there is no evidence of a formal thought disorder."
 "Although the presumption of sanity can be overcome or rebutted, the accused is not entitled to a directed verdict on the issue of insanity unless the evidence of insanity is clear, strong and undisputed. Boyle v. State, 229 Ala. 212, 222, 154 So. 575 (1934).
 " 'But courts should be careful not to invade the province of the jury in cases of this character. Although the evidence may be offered only by the defense, and all tend to one conclusion, yet, in view of the presumption of sanity, if the evidence is inconclusive, and reasonable inferences may be drawn that the act was that of a sane man as defined by law, the affirmative charge should be refused.' Boyle, 229 Ala. at 222, 154 So. 575.
". . . .
 "When the accused has offered evidence sufficient to overcome the presumption of sanity, the State is not required to prove his sanity. Howard v. State, 172 Ala. 402, 408, 55 So. 255
(1911). Insanity is an affirmative defense which must be proven by the defendant to the reasonable satisfaction of the jury. The burden of proving insanity never shifts to the State but remains on the defendant throughout the trial. Grammer v. State, 239 Ala. 633, 196 So. 268 (1940). '[A] reasonable doubt of sanity, raised by all the evidence, does not authorize an acquittal.' Boswell, [v. State] 63 Ala. [307, 326 (1879)]. 'It would be an anomaly to require the State to prove a fact which the law presumes to exist, and to authorize such fact to be overturned by the injection into the case of a reasonable doubt of its existence. Such is not the law.' Maxwell v. State, 89 Ala. 150, 164, 7 So. 824 (1890). 'Thus, where the whole evidence does not satisfy the minds of the jury that the accused is insane at the time of the commission of the crime with which he is charged, the jury should convict the defendant, notwithstanding that the medical witnesses were of the opinion that such person was insane.' 31 Am.Jur.2d Expert And Opinion Evidence, Section 186 (1967)."
Cunningham v. State, 426 So.2d 484, 486, 490 (Ala.Cr.App. 1982).
The question presented here is one of the sufficiency of the evidence, although the appellant would have this Court reweigh the evidence. Even in this case where there is considerable evidence of insanity, this Court will not reweigh the evidence.Ellis v. State, 570 So.2d 744, 755-756 (Ala.Cr.App. 1990). "Even though an appellate court should 'marvel that a jury would convict upon such flimsy proof,' it is 'not permitted to pass upon the weight or sufficiency of the evidence, where it may yield any rational inference of guilt.' " Granger v. State,473 So.2d 1137, 1139 (Ala.Cr.App. 1985).
 "We hesitate to take from the jury any case where there is evidence of conscious guilt at the moment the deed was perpetrated. . . . In such case, it is for the jury to say whether [the defendant's diseased mind] was the sole cause of the deed."
Boyle v. State, 229 Ala. 212, 224, 154 So. 575, 586 (1934).
In this case, the appellant's actions and conduct immediately after the shooting — his statements acknowledging responsibility *Page 236 
for the shootings and his request for an attorney — are indications of sanity. "[C]almness, indifference to results, consciousness of the moral or legal criminality of the act, with connectedness in the employment of the reasoning faculty, while not conclusive evidence of sufficient sanity to justify criminal punishment, are nevertheless strong circumstances tending to prove legal accountability." Boswell v. State,63 Ala. 307, 320 (1879). The mere arbitrariness and depravitity of the shooting in this case tends to indicate that the appellant must have been insane. However, that in itself is not a legal basis for a directed verdict. Ellis, 570 So.2d at 753.
Here, there was evidence to indicate that the appellant was able "to appreciate the nature and quality or wrongfulness of his acts." § 13A-3-1(a). However, while there was substantial evidence that the appellant was psychotic at the time of the shootings, there was not overwhelming and uncontradicted, clear, and strong evidence that the appellant was unable to appreciate the nature and quality or wrongfulness of his actions. Without reweighing the evidence and substituting our opinion for that of the jury, this Court cannot reverse the appellant's conviction on the ground of proof of insanity.
 II.
The trial court properly refused to give the appellant's requested charge No. 41 to the jury. That charge stated:
 "If a Defendant in a criminal case is found not guilty by reason of insanity, this Court shall forthwith determine whether the Defendant should be held for a hearing on the issue of his involuntary commitment to the Alabama State Department of Mental Health. If this Court determines that there is probable cause to believe that the Defendant is mentally ill and as a consequence of such mental illness poses a real and present threat of substantial harm to himself or to others, then this Court shall order the Defendant into the custody of the Sheriff until a hearing can be held to determine whether the Defendant shall be involuntarily committed. If the Court does not make such a determination, then the Defendant shall be forthwith released from custody (Alabama Code Section 15-16-41)."
As this Court stated in Gray v. State, 482 So.2d 1318, 1321
(Ala.Cr.App. 1985), "this issue is not within a jury's sphere of concern." See also Carr v. State, 43 Ala. App. 642, 649,198 So.2d 791, 798, cert. denied, 281 Ala. 716, 198 So.2d 798, cert. denied, 389 U.S. 877, 88 S.Ct. 175, 19 L.Ed.2d 165
(1967).
 III.
The trial court properly prohibited the appellant from asking the following question of the jury on voir dire:
 "Do you know that in the event you find him not guilty by reason or mental disease or defect, that the court will have a commitment hearing to determine whether the defendant should be involuntarily committed to a state mental hospital?"
As recognized in Part II of this opinion, a jury in Alabama, in other than capital cases, is concerned only with the appellant's guilt or innocence. What happens to the defendant after their determination of that question is not their concern.
 IV.
The trial court properly refused to give the following instructions requested by the appellant:
 "35. A crime includes both the act and intent and an unsound mind cannot form a criminal intent. Insanity is a complete answer to a criminal charge."
 "36. Every act of the Defendant's life is relevant to the issue of insanity."
 "38. Insanity of a chronic or permanent nature, which on being proved, is presumed to continue."
Charge No. 35 was fairly and substantially covered when the trial court orally instructed the jury that insanity is an affirmative defense, and that "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect, he lacks substantial *Page 237 
capacity to appreciate the criminality of his conduct."
Charge No. 36 is not a correct statement of law. "Where insanity is relied upon as a defense, every act of the accused's life which throws some light on such issue is relevant thereto." Nichols v. State, 276 Ala. 209, 211,160 So.2d 619, 621 (1964) (emphasis added). The trial court properly instructed the jury in this regard.
Charge No. 38 was properly refused because in this case the uncontradicted evidence was that, while schizophrenia could not be cured, there could be periods of remission. Dr. Rogers testified that "there is a residual phase or a period of time when the person is getting better or may have all the symptoms go into remission. Remission is a term meaning that the symptoms are controlled or they've gone away." Dr. Bryant testified that "[a]ll mental patients have lucid periods. That meaning, that at times they are aware of reality." He also testified that "it is possible for a person diagnosed as suffering from paranoid schizophrenia to know right from wrong and appreciate the nature and quality of his conduct." Here, the presumption contained in the requested charge was not applicable because the appellant failed to prove that his insanity was habitual and permanent in its nature. Lewis v.State, 439 So.2d 1357, 1358 (Ala.Cr.App. 1983).
 V.
The trial court did not err in allowing the officers to testify as to the statements made by the appellant at the time of his arrest and while being transported to the police station.
The trial court granted the appellant's motion to suppress the evidence obtained in a consent search of his residence. Although the trial court stated no reason for granting the motion, it appears from the testimony presented at the hearing on the motion to suppress the search evidence that the appellant requested an attorney at "approximately 1200 hours" on April 11, 1989. The consent to search was obtained approximately 50 minutes later. The trial court may very well have concluded that obtaining the consent to search without a showing that the appellant had consulted with an attorney after having requested one rendered the consent involuntary. See 3 W. LaFave, Search and Seizure § 8.2(k) (2d ed. 1987). The trial court may also have concluded that obtaining the consent to search after the appellant had invoked his right to counsel violated Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880,68 L.Ed.2d 378 (1981), holding that once a suspect asserts his right to counsel, all police initiated questioning must cease until counsel is provided.
The evidence shows that the appellant's statements following his arrest were spontaneous and voluntary. It appears that the appellant knew what he was talking about at the time he made the statements and that his mental faculties were not impaired.McCord v. State, 507 So.2d 1030, 1033 (Ala.Cr.App. 1987). Therefore, we find no error in the admission of the appellant's spontaneous admissions and statements following his arrest.
 VI.
The record shows that the prosecutor did not violate the holding of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1986), in using four of its nine peremptory strikes to remove blacks from the jury venire.
The prosecutor gave the following reasons for striking the black venire persons. One venire person indicated that she knew the appellant's ex-wife and stated that she had a nephew who had been charged with a crime. The second venire person indicated that she knew Reverend Goyens, a witness for the defense. The third venire person was a nurse and indicated that she had a relative who had had a nervous breakdown. The prosecutor also stuck a white venire person who was a nurse. The fourth venire person was a "preacher" wearing a large cross on his chest, and a preacher was going to be a witness for the defense. Under the circumstances of this particular case, we consider these reasons to be race neutral. *Page 238 
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.