On December 18, 2000, Elvin Ray Vaughn was indicted by a Lauderdale County grand jury on three counts of attempted murder and three counts of assault in the second degree. Vaughn pleaded not guilty and not guilty by reason of mental disease or defect on all counts. On August 31, 2001, a jury convicted Vaughn of one count of attempted murder and two counts of assault in the third degree. The trial court sentenced him to 25 years' imprisonment for the attempted-murder conviction and 12 months' imprisonment for each assault conviction, the sentences to be served concurrently, and imposed monetary sanctions. Vaughn appealed to the Alabama Court of Criminal Appeals on October 11, 2001, challenging the trial court's admission of evidence regarding prior "bad acts" on the ground that the prejudicial effect of that evidence substantially outweighed its probative value. That Court affirmed the trial court's decision in an unpublished memorandum, Vaughn v. State, 854 So.2d 1222
(Ala.Crim.App. 2002) (table).
Vaughn petitioned this Court for a writ of certiorari to review the Court of Criminal Appeals' affirmance of the trial court. We granted Vaughn's petition on July 12, 2002, to address the question whether the Court of Criminal Appeals properly affirmed the trial court's judgment in light of the admission of evidence of Vaughn's prior bad acts.
The record reveals that on July 12, 2000, Vaughn reported to work at the Royster-Clark fertilizer plant ("the plant") in Florence, where he had been employed for an unspecified period.[1] Upon arriving at the plant, at or about 5:50 a.m., Vaughn proceeded to the "hourly showers," a location in the plant where workers shower and place their belongings in lockers.[2] Already in the hourly shower area when Vaughn arrived were coworkers Jerry Whiteside, Alex Armstead, Jr., and Lawson Garth. During the time Vaughn was in the hourly shower area he did not speak to his coworkers. Vaughn was described by his coworkers as a quiet man, and his lack of communication with them that morning was not uncommon. Shortly after arriving in the hourly shower area Vaughn left, and approximately five minutes later, was followed by his coworkers. The first one out of the door after Vaughn was Whiteside, followed by Armstead and *Page 1092 
Garth, all of whom started down the outside stairs toward the employee parking lot.
Whiteside testified that as they proceeded down the stairs he was speaking to another plant employee who was standing at the bottom of the stairwell, and when he was approximately halfway down the stairwell he noticed Vaughn in the parking lot, and he saw him retrieving something from the trunk of his vehicle. Vaughn then pulled a rifle from the trunk, said "Jerry, you done me wrong," and fired two shots in the direction of Whiteside and his other coworkers who were coming down the stairs. Whiteside, Armstead, and Garth retreated up the stairs and into the hourly showers. All three men suffered injuries from fragments of concrete, which shattered after the building was hit by the bullets, or fragments from bullets that ricocheted off the building. After the shots were fired, Vaughn was seen leaving the employee parking lot in his vehicle in what was described as a slow and normal manner. That same morning Vaughn turned himself in to the Florence Police Department and told the officer on duty that he had been in an altercation at work and that the police might be looking for him.
At trial, Vaughn supported his plea of not guilty by reason of mental disease or defect by offering the testimony of Dr. Allen Shealy, a psychologist hired by the defense. Dr. Shealy testified that during his evaluation of Vaughn, Vaughn stated that many of his coworkers, in particular Whitehead, had spread rumors around the plant regarding his sexual orientation. Vaughn stated that the same rumors were being spread around his church as well. Dr. Shealy also testified about an incident Vaughn described that occurred approximately 14 years before the incident at the fertilizer plant while Vaughn was living in Illinois, when another man called him a "rosebud." Dr. Shealy determined that Vaughn was suffering from paranoid delusions, which caused him to believe people were saying things about him when they in fact were not, and that that belief had led him to shoot at his coworkers. Before Dr. Shealy testified, the parties and Dr. Shealy had a colloquy with the judge outside the presence of the jury regarding prior bad acts committed by Vaughn. In that colloquy, Dr. Shealy discussed two prior incidents, one of which occurred while Vaughn was serving in the military, for which he was convicted of manslaughter, as well as an incident in which Dr. Shealy believed the charges had been dropped.[3] However, Dr. Shealy did not describe the incidents he referred to. Dr. Shealy also explained to the trial judge that these earlier incidents were not important to his evaluation of Vaughn because there was no evidence indicating that they were related to Vaughn's mental state or to his mental illness. The trial court therefore prohibited the State from questioning Dr. Shealy about those prior acts.
The State's expert, Dr. Alwyn Whitehead, also a psychologist, stated, however, in a similar colloquy with the judge outside the presence of the jury, that Vaughn's prior bad acts were important to his determination of Vaughn's mental state at the time of the incident. Counsel for Vaughn objected to the proposed admission of testimony of Vaughn's prior bad acts, arguing that the prejudicial effect of informing the jury of the prior acts substantially outweighed the probative value. The trial court allowed Whitehead to testify as to the importance of Vaughn's prior bad acts, *Page 1093 
after giving the following limiting instruction to the jury:
 "Ladies and gentlemen, some of the information that this witness is going to testify to concerns some background information, some actions that were allegedly committed by the defendant in his personal history, his background during his life. That is going to be allowed to be testified to by this witness, but it is admissible for a limited purpose. It is not admissible for you to determine whether or not the defendant actually committed the offense with which he is charged. We refer to that as it's not admissible as substantive evidence of the crime. It's admitted for the limited purpose for you to hear to determine whether or not he was not guilty of this offense by reason of his defense of severe mental disease or defect. So it's important for you to understand that anything this doctor says about what this defendant has done in the past is not to be considered by you when you are in the jury room to determine whether or not he committed the offense. Only if and when you decide that you need to determine whether or not his defense of not guilty by reason of mental disease or defect has any validity, only then would you consider any information that this witness is going to give you about this background. Now, I hope that's not too terribly confusing. But I've made it as clear as I possibly can. It's admitted for a limited purpose only. With that instruction you may go ahead."
The State proceeded to question Dr. Whitehead about Vaughn's personal and family history as well as the prior bad acts. Dr. Whitehead discussed an incident that occurred during the 1980's, while Vaughn was living in Illinois, when he shot an ex-girlfriend as she climbed into the window of his house at night, not knowing who she was.[4] In addition, Dr. Whitehead stated that while Vaughn was serving in the United States Army, he shot a man who allegedly had attempted to stab him during a card or dice game, for which he was convicted of manslaughter.[5] Dr. Whitehead concluded that Vaughn did suffer from a paranoid personality;[6] however, Dr. Whitehead also expressed the opinion that at the time of the shooting at the plant Vaughn was not suffering from symptoms of a major mental illness that would have prevented him from understanding the wrongfulness of his criminal acts. At the close of the trial, and before the jury began deliberations, the trial judge again explained to the jury the limited purpose for which Vaughn's prior acts could be considered.
In its unpublished memorandum affirming Vaughn's conviction, the Court of Criminal Appeals stated:
 "`The general rule is that evidence of other collateral crimes is not admissible as substantive evidence to establish the guilt of the accused of a particular crime, but as with most broad general rules, numerous exceptions have been developed. Twilley v. State, 472 So.2d 1130 (Ala.Crim.App. 1985); Miller v. State, 405 So.2d 41 *Page 1094 
(Ala.Crim.App. 1981); Thompson v. State, 374 So.2d 377
(Ala.Crim.App. 1978), aff'd, 374 So.2d 388 (Ala. 1979); McMurtrey v. State, 37 Ala. App. 656, 74 So.2d 528
(1954); Wilkins v. State, 29 Ala. App. 349, 197 So. 75, cert. denied, 240 Ala. 52, 197 So. 81 (1940); C. Gamble, McElroy's Alabama Evidence, § 69.01(1)-(11) (3d ed. 1977). These exceptions to the general rule fall under the following general divisions: (1) relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. Wilkins v. State, supra; McElroy's, supra. While the general rule is that evidence of separate crimes is inadmissible where the only probative function of such evidence is to show bad character or an inclination or propensity to commit the type of crime for which the accused is being tried, if the accused's commission of another crime or misdeed is an element of guilt or otherwise tends to prove his guilt, then proof of such other crime or misdeed is admissible. Twilley v. State, supra; Watson v. State, 398 So.2d 320 (Ala.Crim.App. 1980), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981); McElroy's, § 69.01(1). Moreover, if the accused's commission of another crime is admissible in a present prosecution, the State may prove in meticulous detail the manner in which the accused committed such other crime. Weatherford v. State, 369 So.2d 863 (Ala.Crim.App. 1979), cert. denied, 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 91
(1979); McElroy's, § 69.02.(8)'
"Nelson v. State, 511 So.2d 225, 233 (Ala.Crim.App. 1986).
 "In the instant case, Vaughn entered a plea of not guilty by reason of insanity. During Dr. Whitehead's evaluation of Vaughn, evidence concerning prior criminal acts committed by Vaughn came to light. Dr. Whitehead considered that evidence in reaching his conclusion that Vaughn was not insane. Therefore, once Vaughn presented evidence in support of his insanity defense, the State could rebut this claim with evidence from Dr. Whitehead concerning Vaughn's prior bad acts. See, e.g., Berard v. State, 486 So.2d 476
(Ala. 1985) (the present `wide latitude rule' does not permit cross-examination of defendant's expert on insanity as to accused's future, potential illegal acts; present rule only opens the door to relevant acts of defendant that were committed up to the time of trial).
 "We hold that the trial court did not err in allowing such evidence of prior criminal acts to be entered into evidence. We agree with the State that they were properly admitted for purposes of rebutting Vaughn's insanity defense.
 "Regarding the alleged prejudice Vaughn suffered from the admission of testimony regarding [those] prior criminal acts,
 "`[a] trial court has broad discretion in determining the relevancy of evidence and whether that evidence is inadmissible because its prejudicial effect substantially outweighs its probative value, and its ruling on these issues will not be disturbed on appeal absent a clear showing of abuse of that discretion.' *Page 1095 
 "Ex parte Dennis, 730 So.2d 138, 143 (Ala. 1999). In any event, the trial court's curative instruction was more that adequate to apprise the jury of the proper relevance of this evidence in [its] deliberations. Thus, Vaughn's argument is without merit."
In his petition, Vaughn contends that the Court of Criminal Appeals erred in affirming the trial court's judgment because, he says, the trial court wrongfully allowed the admission of evidence of prior criminal acts committed by him, and the admission of that evidence resulted in unfair prejudice. "It has long been held that `wide latitude' is allowed both the defendant and the state in inquiries into a person's mental state when an issue as to the sanity of such person is presented" Barbour v. State,262 Ala. 297, 303, 78 So.2d 328, 333 (1954); Peoples v. State,58 So.2d 599(Ala. 1952); Smith v. State, 257 Ala. 47, 57 So.2d 513
(1952); Hall v. State, 248 Ala. 33, 26 So.2d 566 (1946); Parvin v.State, 248 Ala. 74, 26 So.2d 573 (1946); Eldridge v. State, 247 Ala. 153,22 So.2d 713 (1945). "Where insanity is relied upon as a defense, every act of the accused's life which throws some light on such issue is relevant thereto." Nichols v. State, 276 Ala. 209, 211, 160 So.2d 619,621 (1964). "These inquiries, however, are subject to the necessary limitation that the acts, declarations and conduct inquired about must have a tendency to shed light on the accused's state of mind when the act for which he is being tried was committed." Barbour, supra,262 Ala. at 303, 78 So.2d at 333. Vaughn asserts that the prior bad acts in this case did not show anything about his state of mind during the shooting on July 12, 2000. In support of his contention, Vaughn argues that the decision of the Court of Criminal Appeals in its unpublished memorandum is contrary to earlier decisions of this Court in Ex parte Miller,460 So.2d 228 (Ala. 1984), and Watts v. State, 282 Ala. 245, 210 So.2d 805
(1968), and also contrary to an earlier decision by the Court of Criminal Appeals, Pilkington v. State, 46 Ala. App. 716, 248 So.2d 755 (1971).
In Ex parte Miller, the trial court allowed the State to introduce evidence of the defendant's prior convictions, which had occurred four years before the incident that was the basis of the action, in order to challenge the defendant's insanity defense. On appeal, the Court of Criminal Appeals affirmed. This Court reversed the judgment of the Court of Criminal Appeals on the rationale that the State offered no evidence tending to prove that the defendant's mental state during the commission of the prior criminal acts was the same as it was during the commission of the offense at issue. The Miller Court relied on Coffey v. State,244 Ala. 514, 14 So.2d 122 (1943), in which this Court held that a prior criminal act that occurred nine years before the incident at issue in the action could not "shed any light on the issue raised by the insanity plea." 244 Ala. at 521, 14 So.2d at 127. The Coffey Court stated:
 "This appellant was on trial for his life and we are of the opinion that the court below committed reversible error in permitting the state to introduce in evidence that the defendant, at a time far removed from the date of the homicide, assaulted another person, which act could have no possible tendency to prove the sanity of the defendant at the time of the homicide, and which act was in no way admissible under the plea of `not guilty.' Nor do we think that it can be said that such evidence worked no injury to the appellant."
244 Ala. at 521, 14 So.2d at 127-28.
In Watts, supra, the defendant pleaded not guilty and not guilty by reason of *Page 1096 
insanity to a charge of first-degree murder. The prosecution, in rebuttal to the defendant's plea of insanity, introduced evidence of three prior convictions of the defendant. Following the rationale explained inCoffey, supra, this Court held:
 "It would seem clear, therefore, that even though a `wide latitude' is given both the defendant and the State in cases of this type, there is the restriction, imposed by this court, that prior convictions to be admitted must be relevant to the issue of the defendant's insanity at the time he committed the now charged act.
 ". . . The rule of Coffey [v. State, 244 Ala. 514, 14 So.2d 122 (1943)] protects the plea of `not guilty by reason of insanity,' so that it does not bear the unwarranted burden of opening up the door to prejudice naturally resulting from the evidence of prior convictions of crime. Crimes that do not of necessity contribute to the issue of insanity. Such a burden would rob the defendant of a proper use of an allowable plea. In this case, the State was allowed to introduce three prior convictions of the defendant which were dated seven years, twenty-seven years, and thirty-two years prior to the date of the case. We cannot see how these would have any relevancy to the issues presented at the trial. Here, the defendant did not take the stand, yet out of his mouth, so to speak, his prior bad record testified against him."
282 Ala. at 247-48, 210 So.2d at 808 (emphasis added). Vaughn did not take the stand at the trial of his case.
In Pilkington, supra, the Court of Criminal Appeals reversed a ruling by the trial court that allowed the State, over objection by the defense, to introduce into evidence rebuttal testimony challenging the defendant's insanity defense to a homicide charge, in which the witness testified that two months before the homicide at issue the defendant had assaulted and robbed her. The Court of Criminal Appeals held that the evidence of the assault and robbery "shed no light on the issue of insanity." 46 Ala. App. at 718, 248 So.2d at 757. In reaching its conclusion, the court relied on a quote in an article by Judge McElroy:
 "`. . . Though it is impossible to avoid the conclusion that, in a broad sense, every act of a person's life is relevant to the issue of his mental capacity at any time of his life, it is also possible that evidence of the act of a party at a particular time may have but a glimmer of probative value on the issue of his mental capacity at another time, and yet be likely to stimulate excessive emotion or prejudice against him and thus dominate the mind of the trier of fact and prevent a rational determination of the truth. In a situation of that sort, it would seem that evidence of the act ought to be excluded. . . .'"
46 Ala. App. at 718, 248 So.2d at 757, quoting J.R. McElroy, Relevancy ofEvidence in Alabama Upon an Issue of a Person's Mental Capacity, 4 Ala. Law. 384, 394 (1943).[7]
In this case, the jury was allowed to hear testimony that before the shooting in this case Vaughn had shot two other persons. As was the case in Watts and Coffey, the prior acts committed by Vaughn occurred many years before the act at issue. The State presented no evidence to indicate any correlation between those prior acts and Vaughn's state of mind at the time of the July 12, 2000, shooting. Further, as stated by the Watts Court, supra, the choice made by Vaughn *Page 1097 
not to testify has been jeopardized by the admission of his prior acts, which, in effect, have testified against him. The Court of Criminal Appeals, relying on Berard v. State, 486 So.2d 476 (Ala. 1985), states in their unpublished memorandum that Vaughn opened the door for the State to present evidence of prior acts to rebut his defense of not guilty by reason of insanity. Under the "wide-latitude" theory, the prosecution can bring out all of the "acts and declarations" of the accused. C. Gamble,McElroy's Alabama Evidence, § 69.01(10) (5th ed. 1996). However, as the Court of Criminal Appeals noted in its unpublished memorandum, "the present rule only opens the door to relevant acts of [the] defendant that were committed up to the time of trial" (emphasis added). In this case, the State has presented nothing to indicate that the prior acts committed by Vaughn were relevant to his mental state during the shooting that occurred at his workplace many years later. Thus, the rationales ofWatts, Coffey, Miller, and Pilkington, supra, strongly suggest that the trial court erred in allowing the jury to hear Whitehead's testimony concerning Vaughn's prior actions.
The State argues that Dr. Shealy's testimony that Vaughn experienced the same ideations 14 years earlier supports the inference that he may have been suffering from the paranoid personality disorder for a long time;[8] hence, the State contends that Vaughn's prior acts are relevant, and, therefore, that this Court's holding in Grammer v. State,239 Ala. 633, 196 So. 268 (1940), rev'd on other grounds, Prince v.Lowe, 263 Ala. 410, 82 So.2d 606 (1955), should control. We disagree. InGrammer, the defendant was charged with first-degree murder, to which he pleaded not guilty by reason of insanity. The record revealed that Grammer, unlike Vaughn, had been in and out of various veterans' hospitals and had received treatment for abnormal mental conditions at various facilities before the act at issue in the case. The record also showed that Grammer, unlike Vaughn, had been adjudged insane in the Tuscaloosa County Probate Court. Grammer had also been diagnosed with various mental conditions, including paranoid personality disorder. At trial, the court allowed the prosecution to question Grammer's wife about Grammer's prior conviction for assault with a deadly weapon. The Supreme Court, stating "[t]his issue gives much latitude to the defendant and the State to introduce evidence of defendant's acts, declarations, and conduct prior and subsequent to the alleged crime," 239 Ala. at 638,196 So. at 272, held that there was no error in the trial court's ruling.
In the instant case, there is no evidence in the record indicating that Vaughn, a 58-year-old man, had ever suffered from any type of mental abnormality or condition or that he had ever been treated for any type of mental illness before the July 12, 2000, shooting. Moreover, the record does not contain any evidence indicating that at the time Vaughn committed the prior bad acts they were the result of any paranoid-personality disorder or any other type of mental abnormality. Nor does the record indicate that Vaughn's prior acts were the result of a wicked propensity. To the contrary, as far as was revealed by the evidence presented to the jury in this case, Vaughn's act of shooting his ex-girlfriend was his reasonable response to an unknown intruder entering his home. Likewise, the record shows that in the other *Page 1098 
shooting Vaughn shot the man only after the man had apparently attempted to rob and stab Vaughn. Neither of those actions on its face supports an inference concerning Vaughn's mental state at the time of the July 12, 2000, shooting, and the State supplied neither lay nor expert testimony to show the relevance between the prior acts and Vaughn's mental state at the time of the shooting in this case.
Finally, the State argues that Dr. Whitehead's testimony regarding Vaughn's prior bad acts was necessary to explain the conclusions he reached upon his evaluation of Vaughn, and, therefore, that the prejudicial effect of that evidence did not substantially outweigh its probative value. The State argues, moreover, that even if the admission of the prior bad acts did cause prejudice in the minds of the jurors, the limiting instruction given by the judge cured any prejudicial impact of such evidence against Vaughn.
We do not doubt that Dr. Whitehead considered Vaughn's prior bad acts in his evaluation; however, the record does not show any instance where Dr. Whitehead explained the relevance of those acts and what role they actually played in the process by which he reached his conclusion. During the State's questioning of Dr. Whitehead and his description to the jury of Vaughn's prior acts, the following exchange took place:
 "Q: All of this [the description of Vaughn's prior acts] sort of speaks to what you're gonna tell us about your diagnosis later on, does it not?
"A: Yes, sir."
However, the record shows that Dr. Whitehead never explained how Vaughn's prior acts led to his diagnosis that Vaughn suffered from a mental abnormality.
Because there was no explanation as to the consideration he gave Vaughn's prior bad acts, Dr. Whitehead could have simply stated that he did consider personal history in his evaluation, rather than describing the events and risking the substantial likelihood of prejudice. "`One of the specific criterion [sic] to be used, in deciding when prejudicial effect substantially outweighs probative value, is whether or not there exist less prejudicial means of providing the same thing. If such alternative, less prejudicial evidence exists, then such availability argues in favor of excluding the prejudicial evidence.'" R.D.H. v.State, 775 So.2d 248, 254 (Ala.Crim.App. 1997), quoting C. Gamble,McElroy's, § 20.01. "`Whether the improper admission of evidence of collateral bad acts amounts to prejudicial error or harmless error must be decided on the facts of the particular case.'" Hunter v. State,802 So.2d 265, 270 (Ala.Crim.App. 2000), quoting R.D.H. v. State, 775 So.2d at 254. "The standard for determining whether error is harmless is whether the evidence in error was `harmless beyond a reasonable doubt.'" 802 So.2d at 270, citing Schaut v. State, 551 So.2d 1135, 1137
(Ala.Crim.App. 1989), in turn citing Chapman v. California, 386 U.S. 18
(1967).
The State's argument concerning the effect of the trial court'slimiting curative instruction relies upon the general rule regarding limiting instructions. Generally, the effect of curative instructions on prejudicial statements made before the jury is that "`[w]here the trial court immediately instructs the jury not to consider a fact, that instruction, in effect, removes or excludes that matter from the jury's consideration, and the prejudicial effect of the statement is deemed to be cured by such instruction.'" Wilson v. State, 777 So.2d 856, 919
(Ala.Crim.App. 1999), quoting Soriano v. State, 527 So.2d 1367, 1371
(Ala.Crim.App. 1988); Bradley v. State, 450 So.2d 173, 176
(Ala.Crim.App. 1983); *Page 1099 Richardson v. State, 374 So.2d 433 (Ala.Crim.App. 1979); Woods v. State,344 So.2d 1225 (Ala.Crim.App. 1976). However, "curative instructions are used primarily when an objection to prejudicial testimony is sustained."Ex parte Thomas, 625 So.2d 1156, 1158 (Ala. 1993). In this case, the instruction by the trial court was that the jury was to consider the prior acts committed by Vaughn, but for a limited purpose. The limited purpose for which the jury was charged to consider the evidence was to determine the validity of Vaughn's insanity defense. As noted above, the evidence presented by the prosecution was to serve as a basis for Dr. Whitehead's expert determination that Vaughn was not incapable of understanding the nature of his acts on July 12, 2000. However, Dr. Whitehead never informed the jury how the prior acts supported his conclusion that Vaughn did not have a meritorious insanity defense. Therefore, under the facts of this case, we cannot conclude that the potential for prejudice resulting from the trial court's admission of evidence of Vaughn's prior bad acts was resolved by the limiting instruction given to the jury. Accordingly, we hold that the probative value of the evidence of the prior bad acts was substantially outweighed by its prejudicial effect.
For the foregoing reasons, the judgment of the Court of Criminal Appeals is reversed and the cause remanded for the Court of Criminal Appeals to reverse the judgment of the trial court and to remand the cause to the trial court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, LYONS, JOHNSTONE, and WOODALL, JJ., concur.
MOORE, C.J., and SEE, BROWN, and STUART, JJ., dissent.
[1] Jerry Whiteside, a coworker of Vaughn's, stated that he had worked "around" Vaughn for 10 or 11 years. However, he did not state that the only place the two had worked together was at the fertilizer plant.
[2] The hourly shower area is located on the second floor of the plant; the only means of access to it, other than windows, is a stairwell that leads from the employee parking lot.
[3] Nothing in the record indicates whether Vaughn was incarcerated or otherwise punished for the manslaughter conviction.
[4] This is the incident in which Dr. Shealy stated he believed the charges were dropped.
[5] The record does not state the date of this shooting, but we can infer from the record that it occurred before the shooting of the ex-girlfriend.
[6] Dr. Whitehead described a paranoid personality as a disorder where one shows an unjustified suspicious distrust of others. A person interprets unintended meanings into the actions and words of others. A paranoid personality also includes paranoid ideations, a false belief, and paranoid delusions.
[7] We note that the precepts of Miller, Coffey, Watts, andPilkington are also addressed in Rules 401, 403, and 404(b), Ala. R. Evid.
[8] Nothing in the record shows that Vaughn was, or was not, suffering from any mental abnormality 14 years earlier, nor is there any evidence indicating that the statement by a man in Illinois referring to Vaughn as a "rosebud" did not actually occur.