[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 330 
The appellant, Calvin Moore, was indicted by a Jefferson County grand jury on one count of murder made capital because the murder occurred during the commission of a rape and on one count of murder made capital because the murder occurred during the commission of a burglary. See § 13A-5-40(a)(3) and (4), Ala. Code 1975. Moore pleaded not guilty and not guilty by reason of mental disease or defect to both counts in the indictment. A jury found Moore guilty of both counts of capital murder. The trial court accepted the jury's sentencing recommendation and sentenced Moore to life imprisonment without parole on both counts.
The evidence adduced at trial tended to show the following. At around 3:00 p.m. on April 15, 1999, Archie Cooper arrived home from work and found his mother, Pauline Cooper, dead in a bedroom of her Birmingham residence. The back door of the house was open. Pauline Cooper had been stabbed numerous times and had bled to death from her wounds. A number of her injuries were defensive wounds to her hands. Paramedics and police were called to the scene.
Shortly after the police arrived, someone pointed out Moore, who had walked up to the crime scene, as a person who knew Pauline Cooper and who had been seen at Cooper's residence earlier that day. Police officers asked Moore if he would come to the police station for questioning. Moore agreed to accompany the officers to the station house, where, on the evening of April 15, John Ennis, a homicide detective with the Birmingham Police Department, interviewed him. Det. Ennis testified that Moore stated that he had gone to Cooper's house at around 9:00 a.m. that morning, which Moore had maintained was his everyday routine, and that Cooper had come to her door and had told him to come back later because she was not feeling well. Moore told Det. Ennis that he left at that time and did not return to Cooper's place until that afternoon, when he saw the police and paramedics outside her residence. Det. Ennis testified that during the course of the interview, he noticed what he thought might be bloodstains on Moore's shoes and wristwatch, and he collected those items from Moore. He stated that he then asked Moore if he would return to the police station the next day for additional *Page 331 
questioning and that Moore agreed to do so.
The following morning, April 16, Det. Ennis and another detective went to Moore's house to pick him up and drive him to the police station for a second interview. Before leaving Moore's residence, they asked him for, and obtained, the clothing he had worn the previous day. Early in the interview on April 16, Det. Ennis realized that Moore was changing his statement from the one he had made the previous day. At that point, he read Moore his Miranda rights. Det. Ennis testified that Moore waived hisMiranda rights and voluntarily agreed to make a statement. In the statement, which was videotaped, Moore told Det. Ennis that he had found Pauline Cooper's body upon returning to her home on April 15. Moore also stated that he and Cooper were good friends, that they had had a sexual relationship at one time but that Cooper had told him she was no longer interested in such a relationship, and that he had once asked Cooper to marry him but she had turned him down. Moore told Det. Ennis that he had last had sex with Cooper in 1997 or 1998.
The State's theory at trial was that Moore raped and murdered Cooper out of anger over her having rejected his romantic and sexual overtures. The State offered testimony from several of Cooper's family members,[1]
who stated that Moore would often come by Cooper's house and that Cooper was friendly with Moore, but that they were unaware of any romantic or sexual relationship between Cooper and Moore. Cooper's daughter testified that Cooper had told her that Moore "liked her in that way, but she didn't like him like that." (R. 361-62.) The defense, however, presented witnesses who maintained that they believed there was a romantic and sexual relationship between the two.
Angelo Della Manna, a scientist with the DNA unit of the Alabama Department of Forensic Sciences' crime lab, testified concerning his analysis of a rape kit performed during the autopsy of Pauline Cooper. Della Manna stated that the DNA profile of semen found on a vaginal swab taken from Cooper's body matched Moore's. According to Della Manna, Moore's DNA profile is "extremely rare" and occurs in "approximately one of 77.5 billion white individuals, and one of 54.9 million black individuals."[2] Della Manna also testified concerning his analysis of the shoes and other items of clothing that Moore was wearing on the day of the murder. He stated that he found several small blood spatters on Moore's shoes that appeared to have been deposited with a low to medium amount of force, which he said was consistent with what might occur during a beating or a stabbing. Della Manna found similar blood spatters on a baseball cap Moore was wearing on the day of the murder. Della Manna also found a small triangle-shaped bloodstain on the left calf of Moore's pants. The stain was consistent with someone having wiped a bloody triangular-tipped knife across the surface of the pants. Testing also revealed a small amount of blood on the wristwatch Moore was wearing on the day of the murder. Della Manna testified that he was unable to determine whose blood was on Moore's shoes or on the other items of Moore's clothing that he analyzed, and that he was unable to ascertain if any of the blood was human blood.
Moore testified on his own behalf. He stated that he had known Pauline Cooper *Page 332 
for several years, that he visited her house almost every morning, and that he and Cooper would sit and watch television together. He stated that they never argued or fought. He maintained that he and Cooper started having sexual relations in 1997 or 1998 and that they continued to have sex occasionally after that, but that he was not her boyfriend. He stated that although Cooper had a boyfriend, it did not make him angry to see Cooper and her boyfriend together. Moore testified that he and Cooper had consensual sex on the night before her murder. He further testified that on the day Cooper was murdered, he went to her house at around 9:00 a.m. and that Cooper came to her door and told him to come back later because she was not feeling well. Moore stated that he left and returned later, but that no one answered when he knocked on Cooper's door. According to Moore, the door opened as he knocked, so he entered the house. Moore stated that he then found Cooper lying on a bed in one of the rooms; she appeared to be dead. He stated that he got scared and left without calling the police.
In support of his alternative plea of not guilty by reason of mental disease of defect, Moore offered the testimony of Dr. Alan Blotcky, a clinical psychologist hired by the defense. Dr. Blotcky testified that he evaluated Moore at the Jefferson County jail in January 2001 and that he also reviewed Moore's medical records. He stated that he administered a verbal IQ test to Moore and that Moore scored a 59, which put him in the mildly retarded range. Dr. Blotcky testified that Moore suffered from schizophrenia and that his medical records indicated that he had been receiving treatment for that mental illness since the 1970s. According to Dr. Blotcky, Moore's medical records also indicated that Moore sometimes had difficulty taking the antipsychotic medication that had been prescribed for him, and that his failure to take the medication caused the symptoms of his schizophrenia to get much worse. Dr. Blotcky stated that, in his opinion, Moore's schizophrenia could have caused him to do acts that he later could not recollect and as to which, at the time he was committing them, he would have no understanding of their wrongness. The defense also presented testimony from A.B. Jackson, Moore's brother-in-law, who stated that he had noticed Moore on many occasions apparently speaking in response to voices when no one was talking to him. Jackson also testified that he had seen scars on Moore's body that were apparently the result of self-mutilation. Donna Click, a social worker who worked as a liaison between the criminal justice system and the mental health system, testified that she talked to Moore when he was brought into the jail after his arrest for Pauline Cooper's murder. According to Click, Moore was extremely upset — he was crying, and shaking, and near "hysteria." (R. 909.)
The State's expert, Dr. Kamel Nagi, a forensic psychiatrist for Taylor Hardin Secure Medical Facility, testified that he evaluated Moore at the Birmingham jail in January 2001 and that he also reviewed Moore's medical records. Dr. Nagi stated that Moore's schizophrenia appeared to be in remission when he met with him, that Moore was taking the medication that had been prescribed for schizophrenia, that Moore did not appear depressed or manic, that his thinking appeared to be logical and rational, and that he exhibited no symptoms of psychosis during the evaluation. Dr. Nagi opined that Moore had the ability to distinguish between right and wrong at the time of the offense. He stated that Moore's schizophrenia did not affect his ability to distinguish between right and wrong, but that it affected only *Page 333 
his ability to control his emotions. Dr. Nagi testified that it was his opinion that if Moore did rape and murder Pauline Cooper, his acts were not caused by his mental illness but were more likely motivated by "[rejection over] sex, and money, and . . . [a] domestic dispute." (R. 544; R. 554.)
On appeal, Moore contends that the trial court erred in allowing the State to introduce, during the guilt phase of its case-in-chief, evidence of Moore's prior convictions, specifically a 1969 conviction for assault with intent to murder, a 1971 conviction for assault with intent to ravish, and a 1977 conviction for murder.
Before trial, Moore moved in limine to prevent the State from introducing evidence of his prior convictions.[3] Moore maintained that the prior convictions were inadmissible under Rule 404(b), Ala. R. Evid., because, he argued, they were irrelevant to any issue in the case and their prejudicial effect outweighed their probative value. The prosecutor argued that the prior convictions would be admissible pursuant to 404(b), Ala. R. Evid., to show identity, intent, and motive and that they were also admissible to rebut Moore's defense of not guilty by reason of mental disease or defect. In addition, the prosecutor argued that the prior convictions would be admissible pursuant to Rule 609(a), Ala. R. Evid., to impeach Moore's credibility if Moore chose to testify on his own behalf at trial. Moore, however, maintained that under Rule 609(b), Ala. R. Evid., the prior convictions were inadmissible for impeachment purposes because, he argued, they were too remote in time. The trial court ruled that Moore's prior convictions would be admissible under Rule 609(a) to impeach Moore if he took the stand and testified; however, the court reserved ruling on the admissibility of the prior convictions under Rule 404(b) or to rebut Moore's defense of not guilty by reason of mental disease or defect.
At trial, during the guilt phase of its case-in-chief, the State sought to introduce the evidence of Moore's prior convictions through the testimony of Det. John Ennis of the Birmingham Police Department, arguing, as it had at the motion in limine hearing, that the prior convictions were admissible under Rule 404(b) to show identity, intent, and motive and to rebut Moore's defense of not guilty by reason of mental disease or defect. Moore renewed his objection to the admission of evidence of his prior convictions. The trial court overruled Moore's objection, and Det. Ennis then testified that Moore had been convicted in 1969 for assault with intent to murder, in 1971 for "rape" [sic], and in 1977 for murder. Det. Ennis did not testify concerning the specific facts underlying any of Moore's prior convictions, and the State presented no other evidence concerning the details of the convictions.
Later at trial, during the guilt phase of the defense's case, Moore took the stand and testified on his own behalf. At the close of the guilt phase of the trial, before the jury began its deliberations, the trial court instructed the jury that it could consider the evidence of Moore's prior convictions for the purpose of assessing Moore's credibility as a testifying witness and in determining the weight to give Moore's testimony. In addition, the trial court instructed the jury that the court had allowed the evidence of Moore's prior convictions "for the limited purpose of showing motive, opportunity, intent, preparation, *Page 334 
plan, knowledge, identity, or absence of mistake or accident." (R. 1000.)
Moore contends that the State has no proper justification for the admission of the evidence of his prior convictions. He claims that the evidence was impermissible character evidence that does not fit into any exception in Rule 404(b), Ala. R. Evid., and that the convictions were too remote in time to be admissible for purposes of impeachment under Rule 609(a), Ala. R. Evid.
Rule 404(b), Ala. R. Evid., provides, in pertinent part:
 "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."
As this court observed in Woodard v. State, 846 So.2d 1102
(Ala.Crim.App. 2002):
 "Evidence of collateral crimes is `presumptively prejudicial because it could cause the jury to infer that, because the defendant has committed crimes in the past, it is more likely that he committed the particular crime with which he is charged — thus, it draws the jurors' minds away from the main issue.' Ex parte Drinkard, 777 So.2d 295, 296 (Ala. 2000). In Robinson v. State, 528 So.2d 343 (Ala.Crim.App. 1986), this Court explained the exclusionary rule as follows:
 "'"'On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question.'" Pope v. State, 365 So.2d 369, 371 (Ala.Cr.App. 1978), quoting C. Gamble, McElroy's Alabama Evidence § 69.01 (3d ed. 1977). "`This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.'" Ex parte Arthur, 472 So.2d 665, 668 (Ala. 1985), quoting McElroy's supra, § 69.01(1). Thus, the exclusionary rule serves to protect the defendant's right to a fair trial. "`The jury's determination of guilt or innocence should be based on evidence relevant to the crime charged.'" Ex parte Cofer, 440 So.2d 1121, 1123 (Ala. 1983); Terrell v. State, 397 So.2d 232, 234
(Ala.Cr.App. 1981), cert. denied, 397 So.2d 235 (Ala. 1981); United States v. Turquitt, 557 F.2d 464, 468
(5th Cir. 1977).
 "'"If the defendant's commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by a showing of bad character, then proof of such other act is admissible." Saffold v. State, 494 So.2d 164 (Ala.Cr.App. 1986). The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove *Page 335 
intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. Willis v. State, 449 So.2d 1258, 1260 (Ala.Cr.App. 1984); Scott v. State, 353 So.2d 36 (Ala.Cr.App. 1977). However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. "`Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government's case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.'" Averette v. State, 469 So.2d 1371, 1374 (Ala.Cr.App. 1985), quoting United States v. Turquitt, supra at 468-69. "'"Prejudicial" is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.' [Citation omitted.] `Of course, "prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one."'" Averette v. State, supra, at 1374.'
"528 So.2d at 347."
846 So.2d at 1106-07.
Here, the trial court ruled that the evidence of Moore's prior convictions was admissible to show identity, intent, and motive. However, those exceptions to the exclusionary rule were inapplicable under the facts of this case and could not have formed the basis for admitting the prior convictions during the State's case-in-chief. For evidence of the accused's commission of another crime or bad act to be admissible to show identity, the now-charged crime must be committed in the same novel or peculiar manner as the previous crime. See, e.g., Exparte Baker, 780 So.2d 677, 679-80 (Ala. 2000); Bighames v. State,440 So.2d 1231, 1233 (Ala.Crim.App. 1983). See also Charles W. Gamble,McElroy's Alabama Evidence § 69.01(8) (5th ed. 1996). Here, the State made no attempt to establish the circumstances surrounding any of the prior crimes for which Moore was convicted, much less any attempt to suggest how the circumstances surrounding the prior crimes were similar to those surrounding the presently charged crime. Thus, Moore's prior convictions were not admissible under the identity exception. Nor were the prior convictions admissible to show intent or motive, because there was no showing that the acts underlying the prior convictions had a logical tendency to lead to any inference that Moore, because he committed those prior acts, had the prerequisite intent to commit the now-charged crime or was motivated to commit the now-charged crime. See, e.g., Ex parte Killough, 438 So.2d 333, 335-36 (Ala. 1983). See alsoMcElroy's Alabama Evidence §§ 69.01(5) and (7). Moreover, Moore did not claim inadvertence or self-defense, and intent was evident from the nature of the present crimes. See, e.g., Brewer v. State, 440 So.2d 1155,1159 (Ala.Crim.App. 1983). *Page 336 
Although Moore did claim at trial that he had had consensual sex with Pauline Cooper on the night before her murder, we do not find that Moore's 1971 conviction for assault with intent to ravish — an offense that occurred more than 25 years before the present offense and that was committed under unrelated circumstances against a third party with no apparent connection or relevant similarity to the victim in the present case — has any bearing on the issue of Moore's intent to commit a rape in the present case or his motive to commit such an offense. See Ex parteCofer, 440 So.2d 1121, 1124 (Ala. 1983).[4] Likewise, the State should not have been allowed to supply Moore's intent to kill in the present case, or an apparent motive for the murder, by showing that he had assaulted and killed other persons on unrelated occasions under what appear to be wholly unrelated circumstances. See Aaron v. State,596 So.2d 29, 30-31 (Ala.Crim.App. 1991); Caylor v. State, 353 So.2d 8,10 (Ala.Crim.App. 1977). Such evidence, in its final analysis, shows nothing more than that Moore's character is bad. This is, of course, not an acceptable purpose for admitting the evidence. See Ex parte Killough, 438 So.2d at 336. Thus, Moore's prior convictions were not admissible under either the intent exception or the motive exception.
The trial court also ruled that the evidence of Moore's prior convictions was admissible to rebut Moore's defense of not guilty by reason of mental disease or defect. However, even though wide latitude to inquire into the acts of a defendant's life is given both the defendant and the State in cases where insanity is relied upon as a defense, Alabama courts have imposed the restriction that prior bad acts, to be admitted in such cases, "`must have a tendency to shed light on the accused's state of mind when the act for which he is being tried was committed.'" Ex parte Vaughn, [Ms. 1011416, December 20, 2002]869 So.2d 1090, 2095 (Ala. 2002), quoting Barbour v. State, 262 Ala. 297, 303,78 So.2d 328, 333 (1954). See also, e.g., Ex parte Miller, 460 So.2d 228,229 (Ala. 1984); Watts v. State, 282 Ala. 245, 247, 210 So.2d 805, 807
(1968); Coffey v. State, 244 Ala. 514, 520-21, 14 So.2d 122, 127-28
(1943); Pilkington v. State, 46 Ala. App. 716, *Page 337 
717-18, 248 So.2d 755, 756 (1971). Here, the State made no attempt to offer any evidence indicating that Moore's state of mind was the same at the time of his prior convictions as it was at the time of the commission of the present offense, and no effort was made to explain how the evidence of the prior convictions was pertinent to rebut Moore's insanity defense. As we have noted, the State offered no evidence concerning the specific facts underlying any of Moore's prior convictions. Moreover, neither the State's expert nor the defense's expert indicated that consideration of Moore's prior convictions played a role in their conclusions regarding Moore's mental state at the time of the present offense. Indeed, the State supplied neither lay nor expert testimony to show the relevance between the prior convictions and Moore's mental state at the time of the present offense. See Ex parte Vaughn, supra, 869 So.2d at 1098. Finally, the trial court did not instruct the jury that it could consider Moore's prior convictions in connection with his insanity defense in order to determine his mental state at the time of the present offense. At least with respect to its possible pertinence to the issue of Moore's mental state at the time of the present offense, the evidence of his prior convictions was simply placed before the jury and left to do its damage. Because the State presented nothing to indicate that the prior convictions were relevant to Moore's mental state at the time of the present offense, the prior convictions were not admissible to rebut Moore's defense of not guilty by reason of mental disease or defect.
In its brief to this court, the State, perhaps recognizing the weakness of the other rationales for admitting Moore's prior convictions, urges, as the sole basis for allowing such evidence, that the evidence of the prior convictions was rendered competent to impeach Moore's credibility pursuant to Rule 609(a), Ala.R.Evid., once Moore took the witness stand to testify on his own behalf. The State cites Smith v. State, [Ms. CR-97-1258, December 22, 2000] ___ So.2d ___ (Ala.Crim.App. 2000), aff'd in part, rev'd in part on other grounds and remanded, Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala. 2003), where this court held that any error in the admission of the defendant's prior convictions as part of the State's case-in-chief was cured once the defendant took the witness stand, because the defendant's prior convictions became admissible to impeach his credibility when he testified. ___ So.2d at ___.
 "'It is of no "consequence that this testimony may have been incompetent at the time it was offered, if it was subsequently rendered [competent]." Hanners v. State, 147 Ala. 27, 41 So. 973, 975 (1906). "[W]hile, ordinarily, in the introduction of evidence, it should be competent at the time when offered, still, if rendered competent by the subsequent introduction of other evidence, this is sufficient to correct and cure any error that might otherwise have existed in the admission of the evidence first offered." Collins v. State, 138 Ala. 57, 34 So. 993, 994 (1903).'"
Smith, ___ So.2d at ___, quoting Rowe v. State, 522 So.2d 328, 330
(Ala.Crim.App. 1988) (alteration in Smith). Moore maintains that, notwithstanding the fact that he took the stand at trial, his prior convictions were too remote in time to be admissible for impeachment purposes.
Rule 609(a), Ala. R. Evid., allows the credibility of a defendant who testifies to be impeached by evidence of prior convictions punishable by death or imprisonment in excess of one year (i.e., a felony), provided the court determines that the probative *Page 338 
value of the evidence outweighs its prejudicial effect to the defendant. See Rule 609(a)(1)(A) and (B); Ex parte Minor, 780 So.2d 796, 800 (Ala. 2000). Rule 609(b), Ala. R. Evid., provides that evidence of such convictions is not admissible if a period of more than 10 years has elapsed since the date of the conviction or of the release of the defendant from the confinement imposed for the conviction, whichever is later, unless the court determines that the probative value of the conviction "substantially outweighs" its prejudicial effect to the defendant. See McClendon v. State, 813 So.2d 936, 944 (Ala.Crim.App. 2001).
Discussing the length-of-time standard set forth in Rule 609(b), Professor Gamble has stated:
 "[A]ny conviction not more than ten years old, as measured within the above rule, is admissible over a remoteness objection. Any conviction more than ten years old is presumptively too remote and, therefore, inadmissible with residual discretion in the court to admit if, in the interest of justice, it is determined that the probative value of the conviction substantially outweighs its prejudicial impact. . ..
 "The ten-year time period begins to run from the date of release or conviction whichever is later. This, of course, is normally going to be the date of release. . . .
". . . .
 "If the conviction is more than ten years old then a presumption arises that it is too remote and should not be usable for impeachment. Some refer to this presumption as a rebuttable one. It casts upon the offering party the burden of convincing the court that the probative value of the conviction substantially outweighs its prejudicial impact. Among the factors to be considered in the court's balancing determination are the impeaching party's need for the evidence (has the witness, for example, already been impeached), the nature of the crime for which the witness has been convicted (meaning the more relevant to credibility the greater the probative value), the degree of remoteness, the importance of the witness' testimony and the centrality of the credibility issue. If the person being impeached is the accused or a defense witness then similarity to the now-charged crime may be a factor in the balancing determination. Rule 609(b) requires that the probative value be shown to `substantially ' outweigh the prejudice. This means that convictions more than then ten years old will rarely be admitted. In order to guarantee knowledgeable appellate review, the trial court should make an on-the-record determination of the prejudicial balancing issue supported by specific facts."
McElroy's Alabama Evidence § 145.01(19) (5th ed. 1996) (footnotes omitted).
The prior convictions that the State introduced in this case were (1) a 1969 conviction for assault with intent to murder, (2) a 1971 conviction for assault with intent to ravish,[5] and (3) a 1977 conviction for murder. The record reflects that Moore was released from the confinement imposed for the 1977 murder conviction in 1997. Thus, within the application of Rule 609(a) and Rule 609(b), evidence of Moore's conviction for murder was admissible over any remoteness objection, for purposes of impeaching Moore's credibility *Page 339 
as a testifying witness. Accordingly, we credit the State's argument on appeal to the extent that the State maintains that any error in the admission of Moore's prior murder conviction as part of the prosecution's case-in-chief was cured once Moore took the witness stand. See Smith, supra, ___ So.2d at ___.
The admission of Moore's other two prior convictions, however, is more problematic. The record reflects that Moore was released from the confinement imposed for his 1969 conviction for assault with intent to murder no later than 1971, and that he was released from the confinement imposed for his 1971 conviction for assault with intent to ravish no later than 1974. Thus, within the application of Rule 609(a) and Rule 609(b), both the 1969 conviction and the 1971 conviction were presumptively too remote to be admissible for purposes of impeaching Moore's credibility. Did the State then meets its burden of showing that the probative value of these two convictions substantially outweighed their prejudicial impact? Because the record convinces us that that burden was not met here, we conclude that the trial court erred in permitting the State to impeach Moore with evidence of the 1969 and 1971 convictions.
First, the probative value of the 1969 and 1971 convictions is questionable. "The probative value of a prior conviction is a function of at least two factors, the nature of the past crime and the remoteness of the conviction." United States v. Cathey, 591 F.2d 268, 276 (5th Cir. 1979). Here, neither the 1969 conviction nor the 1971 conviction was clearly related to Moore's truth-telling capabilities; that is, neither involved dishonesty or a false statement. See Cathey, 591 F.2d at 276 ("Crimes involving dishonesty or false statement are often more probative of the witness's lack of credibility than even more serious crimes involving violence."). See also C. Gamble, Gamble's Alabama Rules ofEvidence, § 609(b) (1995) (cumulative supp. 2001) ("The more relevant the crime is to credibility, the more likely it is to be admitted despite remoteness. A fraud or false statement conviction, for example, would more likely be admitted than a manslaughter conviction.") (footnotes omitted). Furthermore, Moore was released from the confinement imposed for those convictions more than 25 years before his trial. "[T]he probative value of a prior conviction on the issue of credibility tends to decrease with the passage of time." United States v. Shapiro, 565 F.2d 479,481 (7th Cir. 1977). See also Gamble's Alabama Rules of Evidence, § 609(b) (cumulative supp. 2001) ("Probative value, as a basis for outweighing the prejudice in admitting a conviction more than 10 years old, decreases with each increase in time lapse between the time of the conviction and the time of its offered use for impeachment.").
Next, there were no exceptional circumstances in the case that would justify the use of the 1969 and 1971 convictions to impeach Moore's credibility. As we have noted, Moore's credibility could have been sufficiently impeached by the use of the 1977 murder conviction. There was little need to add the icing of the earlier two convictions. SeeGamble's Alabama Rules of Evidence, § 609(b) (cumulative supp. 2001) ("If the conviction is merely cumulative of other impeachment evidence then its probative value is lessened and its prejudice is thereby increased."). See also Cathey, supra, 591 F.2d at 277 ("[W]hen a party wishes to use on over-age conviction, the trial judge must consider whether the witness already has been impeached, and if so, the probative value of the prior conviction decreases accordingly."). *Page 340 
Particularly troubling, under the facts of this case, was the introduction of Moore's 1971 conviction for assault with intent to ravish. Before the jury, Det. Ennis referred to this conviction as a conviction for rape, and, with regard to that charge, records introduced at trial reflected that Moore was indicted for rape and that he eventually pleaded guilty to the lesser offense of assault with intent to ravish. In any event, the jury was made aware that Moore had previously been convicted of a sex offense involving force or the threat of force. The risk that unfair prejudice would result from the admission of such evidence was especially great. "When the prior conviction and the charged act are of a similar nature, the danger [of unfair prejudice] increases."United States v. Shapiro, 565 F.2d at 481. "[I]f the prior conviction is similar to the new charges, the jury may misuse the prior conviction as evidence of guilt." United States v. Cathey, 591 F.2d at 275. Here, Moore was linked to the crime by, among other things, evidence showing that the DNA profile of semen found on a vaginal swab taken from Pauline Cooper's body matched Moore's. Attempting to offer an innocent explanation for this evidence, Moore testified that he had had consensual sex with Cooper on the evening before the murder. However, the jury, hearing that Moore had previously been convicted of a sex offense, which was described as a "rape" by a State's witness, could hardly avoid drawing the inference that the past sex-offense conviction suggested some probability that Moore committed the rape he was charged with committing under the capital-murder indictment — in which case, of course, the jury would almost surely regard Moore as guilty of committing all of the acts alleged in the capital-murder indictment. The prosecutor, during closing arguments at the guilt phase of the trial, even explicitly drew a connection between Moore's past conviction for having sex with someone "against their consent" and the allegation in the capital-murder indictment that he had raped Pauline Cooper. (R. 947.) "The jury, despite limiting instructions, can hardly avoid drawing the inference that the past conviction suggests some probability that defendant committed the similar offense for which he is currently charged." United States v.Beahm, 664 F.2d 414, 418-19 (4th Cir. 1981). See Gamble's Alabama Rulesof Evidence, § 609(b) (cumulative supp. 2001) ("When the witness being impeached with a stale conviction is the accused, similarity between the convicted crime and the now-charged crime weighs toward exclusion."). Given the nature of the State's evidence, it was arguably more damaging to Moore's defense for the jury to know that he was a prior sex offender than that he had previously been convicted of murder.
We recognize that in balancing probative value versus prejudicial impact, some courts have considered whether other criminal convictions arose after the stale convictions and have deemed such subsequent convictions to have rebutted the presumption, which underlies the remoteness standard of Rule 609(b), that a witness's veracity has improved since the date of a stale conviction. See United States v.Holmes, 822 F.2d 802, 804-05 (8th Cir. 1987); United States v. Brown,603 F.2d 1022, 1029 (1st Cir. 1979) (both cited in Gamble's Alabama Rulesof Evidence, § 609(b) (cumulative supp. 2001)). Indeed, an argument urged by the prosecutor in opposing Moore's motion in limine to prevent the State from introducing his prior convictions was that the time-standard of Rule 609(b) was effectively "tolled" during Moore's 20-year term of imprisonment after his 1977 murder conviction and that, *Page 341 
accordingly, the murder conviction rendered Moore's two earlier convictions not stale. However, given the great weight of the other factors suggesting the prejudicial effect of admitting Moore's earlier convictions, we do not find the fact of his 1977 murder conviction to be sufficiently probative to rebut the presumption underlying the remoteness standard of Rule 609(b).
For the reasons stated above, we find that the State did not meet its burden of showing that the probative value of Moore's 1969 conviction for assault with intent to murder and his 1971 conviction for assault with intent to ravish substantially outweighed their prejudicial impact. See Rule 609(b), Ala.R.Evid. Thus, the trial court erred in admitting evidence of the 1969 and 1971 convictions.[6] We cannot state with fair assurance that the error did not injuriously affect Moore's substantial rights. See Rule 45, Ala.R.App.P. Accordingly, Moore's capital-murder convictions are reversed and this case is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
COBB and SHAW, JJ., concur.
BASCHAB, J., concurs specially, with opinion, which WISE, J., joins.
[1] Two of Cooper's three adult children resided in the house with her.
[2] Moore is African-American.
[3] The State gave Moore advance notice that it intended to introduce the prior convictions at trial.
[4] In Ex parte Register, 680 So.2d 225 (Ala. 1994), the Alabama Supreme Court, recognizing a trend toward liberalness in allowing collateral-act evidence in cases involving sex crimes, held that evidence of the defendant's prior sexual misconduct committed upon his natural daughter was properly admitted under the motive exception in a prosecution for sexual offenses that the defendant had committed against his stepdaughters, because such evidence "had some tendency to show that [the defendant] had a passion or propensity for unusual and abnormal sexual relations." 680 So.2d at 228. After Ex parte Register, this court in a number of cases approved the introduction of evidence of a defendant's sexual misconduct with persons other than the victim under the motive exception. See, e.g., Proctor v. City of Prattville,830 So.2d 38, 41 (Ala.Crim.App. 2001); Ritchie v. State, 808 So.2d 71,74-75 (Ala.Crim.App. 2001); Estes v. State, 776 So.2d 206, 210-11
(Ala.Crim.App. 1999); Smith v. State, 745 So.2d 284, 289-90
(Ala.Crim.App. 1998); Worthy v. State, 724 So.2d 55, 59 (Ala.Crim.App. 1998); Campbell v. State, 718 So.2d 123, 129-30 (Ala.Crim.App. 1997). In considering the relevance of one sex offense to show motive for committing another, the inquiry in those cases has turned on the similarity in the circumstances surrounding the collateral acts and the charged offense and the similarity of the relationships between the accused and the victims. In nearly all of those cases, moreover, the victims of the collateral acts and the victims of the charged offense were minors (although this factor is not a prerequisite to applying the motive exception to sex offenses). In any event, there is no suggestion in the record of any similarity in the circumstances surrounding Moore's 1971 conviction for assault with intent to ravish and the circumstances of the present offense, nor is there any suggestion of special similarity of the relationships between Moore and the victims in the two cases.
[5] As noted above, Det. Ennis, in his testimony, referred to the 1971 conviction as a conviction for rape. However, records introduced into evidence at trial reflected that, while Moore was indicted for rape, he pleaded guilty to assault with intent to ravish.
[6] We caution the State, in the event of a retrial, that, based on the record before us, there appears to be no proper justification for admitting evidence of Moore's 1977 murder conviction during the State's case-in-chief.